823 So.2d 877 (2002)
STATE of Louisiana
v.
Roy BRIDGEWATER.
No. 00-KA-1529.
Supreme Court of Louisiana.
January 15, 2002.
Opinion on Rehearing June 21, 2002.
*884 Carol A. Kolinchak, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, Terry M. Budreaux, Asst. District Attorney, Donald A. Rowan, Jr., Caren M. Morgan, New Orleans, Counsel for Respondent.
LOBRANO, Justice Pro Tem.[*]
A Jefferson Parish grand jury indicted defendant, Roy Bridgewater, for first degree murder in violation of La. R.S. *885 14:30.[1] After a trial by jury, defendant was found guilty as charged and sentenced to death based upon the jury's finding of four aggravating circumstances. Asserting twenty-one assignments of error, defendant directly appeals his conviction and sentence. La. Const. Art. V, § 5(D). Finding merit to the argument that the evidence is insufficient to support a first degree murder conviction, we reverse defendant's conviction and death sentence; however, we find the evidence sufficient to support a second degree murder conviction and remand for resentencing pursuant to La. R.S. 14:30.1(B).

Factual and Procedural Background
On the morning of October 31, 1996, Marilyn Williams arrived at her son-in-law's residence in Marrero, Louisiana, as she regularly did each Thursday to clean the house. When she arrived, she found the garage door open and her son-in-law's maroon van missing. When she entered the house, she found signs of ransacking, including blinds pulled down in the den. When she entered the master bedroom, she found both her son-in-law, Nelson Beaugh (then forty-five years old), and his mother, Della Beaugh (then seventy years old), dead. Mr. Beaugh was lying on the bed; Ms. Beaugh was kneeling on the floor at her son's feet. Both victims had been shot in the head.[2] At 10:22 a.m., Ms. Williams called 911 to report this double homicide.
Earlier, at 9:20 a.m. that same morning, another 911 call was made from that same Marrero neighborhood. Only a block away and only an hour earlier, a neighbor, Brenda Menard, was approached by two young, African American males claiming to be painting houses. After she chased the pair away, Ms. Menard spotted them walking in the direction of the Beaugh's residence. Because their story sounded suspicious and because their behavior was perceived as threatening, Ms. Menard called 911. Although the police promptly responded to her call and canvassed the neighborhood, they found no sign of the pair.
Suspecting the pair might be responsible for the double homicide, another neighbor (who was also a police officer) brought Ms. Menard to the crime scene shortly after the bodies were found. Based on Ms. Menard's detailed descriptions of the pair,[3] a police sketch artist produced drawings of the then-unidentified suspects. These drawing were published and televised *886 as wanted bulletins in connection with the double homicide.
Mr. Beaugh's cellular phone records reflected that his cell phone, which he kept in his van, was used at 11:31 a.m. that same day to call defendant's brother's girlfriend. Also, at 1:00 p.m. that day, Mr. Beaugh's maroon van was found abandoned with the engine running in the Iberville Housing Development in New Orleans. Police lifted two fingerprints from the exterior front passenger door of the van that matched Lawrence Jacobs' right index finger. Police also found nearby the charred remains of Mr. Beaugh's briefcase, which had been set on fire. The initial report to the New Orleans Police Department officer was that two African-American males were observed running from the van.[4]
On Saturday night, November 2, 1996, defendant called 911 from a pay phone and turned himself in to the police. The reason defendant turned himself in was twofold: first, he knew there were outstanding attachments on him; and, second, he knew about the wanted bulletins apparently implicating him in the double homicide. Defendant gave four separate statements to the police. The first was an exculpatory statement, which he gave at about 9:00 p.m. that night, denying any involvement and any knowledge of the double homicide. Nonetheless, police detained him on the other attachments while they conducted an investigation. As part of that investigation, police presented Ms. Menard with a photograph line-up. After she positively identified defendant as one of the suspicious pair she spotted in the neighborhood, defendant was arrested for the double homicide.
The next day defendant gave three inculpatory statements.[5] In those statements, he made the following admissions: (i) that he and Jacobs were the suspicious pair Ms. Menard encountered on the morning of the double homicide; (ii) that Jacobs forced Mr. Beaugh into the residence at gun point; (iii) that he accompanied Jacobs into the Beaugh's residence; (iv) that they were both armedJacobs with a .38 revolver, defendant with a broken BB gun; (v) that his role was "the lookout," yet he admitted opening a drawer; *887 (vi) that he was in the Beaugh's garage when he heard three shots fired and saw Jacobs come running out; (vii) that they fled in Mr. Beaugh's van; (viii) that they abandoned the van in the Iberville Housing Development; and (ix) that some of the property (a Casio keyboard and Mr. Beaugh's watch) was located at his girlfriend's house. Based on the latter admission, police conducted a consent search of the girlfriend's house. Detective Dauth testified that the girlfriend's mother, Jeanette Grant, consented to the search and that they found the stolen property defendant described as well as some other property.[6]
On December 5, 1996, defendant and Jacobs, both African-Americans, were jointly indicted for the first degree murders of Nelson and Della Beaugh, both Caucasian-Americans. The trial court granted defendant's motion to sever.
Before going to trial, defendant went through a string of Jefferson Parish Indigent Defender Board ("IDB") attorneys. Initially, the IDB appointed Walter Amstutz as defendant's guilt-phase attorney and Linda Davis-Short as his penalty-phase attorney. In December 1997, Amstutz accepted a job with the Jefferson Parish District Attorney's office; as a result, his motion to withdraw as defendant's attorney was accepted.[7] To replace Amstutz, the IDB appointed Mark Armato. In June 1998, Armato filed a Motion for a Sanity Commission alleging that defendant was not assisting in his defense. Citing a sanity commission hearing done about a year earlier in an unrelated armed robbery-aggravated burglary case in which defendant was represented by another attorney and found competent, the trial judge denied the motion.[8]
On June 15, 1998, defendant's first trial began; however, it ended in a mistrial on June 18, 1998, because Armato developed a conflict of interest.[9] In the summer of *888 1998, the IDB replaced Armato with Ken Dohre. While at his first appearance in the case Dohre indicated that he could not be ready for the tentatively selected October 26, 1998, trial date, the trial court denied the defense's request for a continuance.[10] On October 22, 1998, Dohre moved to withdraw based on "irreconcilable conflicts" with defendant regarding trial strategies. Following an ex parte, sealed hearing, the trial court denied the motion.
On October 26, 1998, defendant's second trial began. At the close of the state's case, the defense rested without putting on any evidence or witnesses. The trial judge personally questioned defendant regarding his desire to neither call any witnesses nor testify. That trial ended with a guilty verdict on October 30, 1998. On the two year anniversary of the crime, a penalty phase was conducted and concluded with the jury unanimously finding four aggravating circumstances and returning the sentence of death.[11] On March 1, 1999, the trial court formally sentenced defendant to death. This direct appeal followed.
As noted at the outset, we hold that the evidence in the record is insufficient to support defendant's first degree murder conviction and death sentence, and thus we vacate that conviction and sentence. However, we find the evidence in the record is sufficient to support a second degree murder conviction.[12] Our holding renders it unnecessary to address any of defendant's assignments of error relating to the penalty phase; consequently, we address in this opinion only his assignments of error relating to pretrial and trial phase issues which would, if meritorious, mandate we *889 remand for a new trial. See State v. Hart, 96-0697 at p. 5 (La.3/7/97), 691 So.2d 651, 655 (citing State v. Bay, 529 So.2d 845(La.1988)).

DISCUSSION

Sufficiency of the Evidence
In reviewing the sufficiency of the evidence to support a conviction, we follow the due process standard of review enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under that standard, "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). That standard "preserves the role of the jury as the factfinder in the case but it does not allow jurors `to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" State v. Pierre, 93-0893 at p. 5 (La.2/3/94), 631 So.2d 427, 429. The jury is not allowed to engage in speculation based merely upon "guilt by association." 93-0893 at pp. 5-6, 631 So.2d at 429. In order for the trier of fact to convict and for the reviewing court to affirm a conviction, the totality of the evidence must exclude reasonable doubt.
Under Jackson, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. See State v. Jacobs, 504 So.2d 817, 820 (La.1987). When circumstantial evidence forms the basis of the conviction, the totality of such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. However, "[h]ypotheses of innocence are merely methods for the trier of fact to determine the existence of a reasonable doubt arising from the evidence or lack of evidence." State v. Shapiro, 431 So.2d 372, 389 (La.1982)(on reh'g)(Lemmon, J., concurring). This circumstantial evidence rule is not a separate test from the Jackson standard; rather, La. R.S. 15:438 merely "provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found defendant guilty beyond a reasonable doubt." State v. Wright, 445 So.2d 1198, 1201 (La.1984). "Although the circumstantial evidence rule may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence." State v. Chism, 436 So.2d 464, 470 (La.1983).
Applying the above guidelines to this case in which the state's proof hinged almost entirely on circumstantial evidence and viewing the evidence in light most favorable to the state, we find merit to defendant's contention that the state failed to exclude a reasonable hypothesis of innocence; namely, that Jacobs was the sole shooter and that defendant was merely present, neither advancing nor assisting Jacobs in shooting the victims. Advocating this reasonable hypothesis, defendant concedes that he entered the Beaugh residence with specific intent to commit aggravated burglary, but contends that he did not have specific intent to kill and, in fact, did not kill anyone.
At trial, the state advanced two possible scenarios for finding defendant guilty of first degree murder: (1) defendant and Jacobs both were shooters; or (2) Jacobs was the sole shooter, and defendant was a principal. Under the first scenario, the *890 state was required to identify defendant as a shooter.[13] Yet, as defendant stresses, the state's opening statement at trial was that we "may never know who fired these shots."
Due to the lack of any eyewitnesses coupled with the equivocal physical evidence, suggesting only a possibility of multiple shooters,[14] the state apparently realized that any attempt to identify the actual shooter would result in a "finger pointing" game between defendant and Jacobs. The state's case thus focused on the second scenariothat even if defendant was not the shooter, he acted in concert with Jacobs, and thus is guilty as a principal under La. R.S. 14:24.[15] To prevail on its principal theory, the state had the burden of proving beyond a reasonable doubt that defendant harbored specific intent to kill the victims, not merely that defendant knew of Jacobs' intent to do so. The shooter's specific intent cannot be transferred to the principal; "[a]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." State v. Pierre, 93-0893 at p. 4 (La.2/3/94), 631 So.2d 427, 428; State v. Holmes, 388 So.2d 722, 726-27 (La.1980)(reasoning that "[p]roof of one person's intent is not proof of another's" and thus that to find non-shooter liable state was require to establish "the circumstances indicated that [non-shooter] also actively desired the death of or great bodily harm to the victim").
In support of its principal theory, the state relies upon our recent holding in State v. Anthony, 98-0406 at p. 14 (La.4/11/00), 776 So.2d 376, 386, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000), for the proposition that the state is not required to prove defendant actually pulled the trigger. In Anthony, supra, however, the evidence reflected the defendant's "participation was major;" the defendant "had, minimally, a neutral element of reckless indifference;" the defendant "intended from the outset to kill these victims;" and the defendant was armed. Id. The same cannot be said of the evidence in this case.
The circumstantial evidence the state relied on in this case to establish defendant's liability as a principal was as follows: (1) that defendant was in the Beaugh's neighborhood on the morning of *891 the double homicide (as established by his own admission and by Ms. Menard's identification); (2) that defendant entered the Beaugh's residence and was armed, albeit with a broken BB gun (as established again by his own admissions); and (3) that defendant failed to prevent (or, as the state argues, attempt to prevent) Jacobs from committing the double homicide. Citing La. R.S. 14:10(1)'s reference to specific intent in terms of an offender's "failure to act," the state argues that the latter apparent failure to act sufficed to establish defendant's specific intent. We disagree.
As a general rule, "liability [as a principal] will not flow merely from a failure to intervene;" however, "silence in the face of a friend's crime will sometimes suffice when the immediate proximity of the bystander is such that he could be expected to voice some opposition or surprise if he were not a party to the crime." 2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 6.7(a)(1986)(Emphasis supplied). Defendant's statement that he was in the Beaugh's garage when the fatal shots were fired places him outside the "immediate proximity" of the double homicide and inside the general rule precluding a finding of liability as a principal based solely on a passive failure to intervene in a friend's criminal acts.
Our finding that the evidence is insufficient to establish defendant's liability as a principal is buttressed by the state's failure to present any evidence establishing defendant's specific intent to kill. No one testified that defendant had anything more than a broken BB gun; indeed, as noted, it was defendant who conceded that much. Ms. Menard, the neighbor, observed no weapons on either of the suspicious pair. This lack of evidence that defendant even was armed with a functional weapon reduces the state's circumstantial case to a request that the jury engage in speculation based merely upon "guilt by association." Pierre, 93-0893 at p. 6, 631 So.2d at 429.
Accordingly, we reject the state's contention that the jury reasonably could have found defendant liable as a principal based merely on his failure to prevent Jacobs from committing the double homicide. We hold that the state failed to exclude a reasonable hypothesis of innocence that defendant was merely present and, for that reason, we reverse defendant's conviction of first degree murder and death sentence. However, as we noted earlier in this opinion,[16] we find that the evidence in the record is sufficient to support a conviction for second degree murder under La. R.S. 14:30.1(A)(2)(a), which defines that crime as the killing of a human being "[w]hen the offender is engaged in the perpetration or attempted perpetration of" certain enumerated felonies, including armed robbery and aggravated burglary, "even though [the offender] has no intent to kill or to inflict great bodily harm." As the state contends, defendant does not dispute that the elements of this lesser included offense were established; defendant concedes that he entered the Beaugh's residence with the specific intent to commit an aggravated burglary. Given that concession, we find the evidence, filtered through the Jackson v. Virginia sufficiency standard, supports a conviction for second degree murder, an authorized responsive verdict to the charge of first degree murder. La. C. Cr. P. art. 814(A)(1). Accordingly, since (as discussed below) we find no meritorious assignments of error and no prejudicial or erroneous ruling, we modify the judgment of guilty of first degree murder, render a *892 judgment of guilty of second degree murder, and remand the case to the district court for sentencing on the modified judgment as set forth in La. R.S. 14:30.1(B).

PRETRIAL ISSUES

Competency Issues
Defendant argues that the trial court erred by simultaneously finding him incompetent to represent himself, yet competent to stand trial. This issue includes three sub-issues: (i) defendant's competence to stand trial, (ii) defendant's right to represent himself, and (iii) defendant's strategic conflict with appointed counsel. We address each of these separately.

(i) defendant's competence to stand trial
La.C.Cr.P. art. 641 provides that "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." The two-fold test of capacity to stand trial is whether the defendant: (1) understands the consequences of the proceedings, and (2) has the ability to assist in his defense by consultation with counsel. Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); State v. Bennett, 345 So.2d 1129, 1138 (La.1977). While a court may receive the aid of expert medical testimony on the issue of competency to proceed, the ultimate decision of capacity rests with the trial court.[17]
Simply because a defendant's capacity to proceed is called into question by formal motion does not mandate a mental examination be ordered and a sanity commission be appointed. La.C.Cr.P. arts. 643, 644; State v. Goins, 568 So.2d 231, 234 (La.App. 3d Cir.1990), writ denied, 573 So.2d 1117, 1118 (La.1991). Appointing a sanity commission is neither a perfunctory matter nor a ministerial duty of the trial court; it is not guaranteed to every accused in every case. State v. Lott, 574 So.2d 417, 424 (La.App. 2d Cir.), writ denied, 580 So.2d 666 (La.1991). Given the presumption of sanity, before the court is required to appoint a sanity commission, the defendant must establish by a preponderance of the evidence that reasonable grounds exist to doubt his mental capacity to proceed. State v. Bickham, 404 So.2d 929, 934 (La.1981); Goins, supra. A reviewing court owes the trial court's determination on these matters great weight, and the trial court's ruling will not be disturbed on appeal absent a clear abuse of discretion. Bickham, supra.[18]
In this case, two different defense attorneys (Dohre and Armato) in five separate motions moved to have the trial court appoint a sanity commission. While both defense attorneys expressed concerns *893 about defendant's competency, both attorneys' main concern was that they could not communicate with defendant because he was "uncooperative, violent, and irrational" and that defendant disagreed with their trial strategies. In denying these multiple motions, the trial judge relied upon two factors: (1) that defendant was found competent about a year earlier, albeit in a different, unrelated case in which he was represented by different counsel; and (2) that in his (the trial judge's) prior interactions with defendant, he personally observed that defendant exhibited a good understanding of his current circumstances and a good handle on legal concepts. Illustrative, in response to the trial judge's questions during a pre-trial hearing on his request to represent himself, defendant explained the charges against him and articulated a relatively complex definition of the legal term principal. Indeed, the prosecutor repeatedly emphasized that defendant gave a better definition of principal than some attorneys.
Citing State v. Synder, 98-1078 (La.4/14/99), 750 So.2d 832, defendant argues that the trial judge abused his discretion in refusing to appoint a sanity commission. Snyder is easily distinguishable. There, we stated that "when such claims [like difficulty communicating with the defendant], combined with objective medical evidence, raised a sufficient doubt as to defendant's competence, we must question whether defendant received a fair trial in this regard." Snyder, 98-1078 at p. 23, 750 So.2d at 850 (emphasis supplied). Unlike in Snyder, defendant offered no medical evidence suggesting he was incompetent.[19]
We do not find that the trial judge abused his great discretion in declining to appoint a sanity commission under the circumstances of this case. Even assuming there was no prior evaluation in an earlier, unrelated case finding defendant competent to proceed, the trial judge was entitled to base his ultimate decision on his extensive prior dealings with defendant. Although two defense counsel voiced concern over defendant's behavior, those objections, standing alone, do not persuade us that the trial judge should have appointed a sanity commission.
In sum, given the presumption of sanity and given the trial judge's numerous chances to observe defendant personally, we conclude that defendant failed to demonstrate the trial judge abused his discretion in denying the numerous motions for the appointment of a sanity commission.

(ii) defendant's right to represent himself
As noted, defendant contends that it was inherently inconsistent for the trial judge to simultaneously find him competent to stand trial, yet incompetent to represent himself. While competency to stand trial is equivalent to competency to represent *894 oneself, the Court in Godinez v. Moran, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), cautioned:
A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. In this sense there is a "heightened" standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of competence.

509 U.S. at 401, 113 S.Ct. 2680. Explaining the latter statement, the Court noted that "competence to waive" counsel has been used as a "shorthand for the `intelligent and competent waiver' requirement." Id. More recently, in Martinez v. Court of Appeal of California, 528 U.S. 152, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000), which held there is no right to self-representation on appeal, the Court commented:
[T]he right to self-representation is not absolute. The defendant must "`voluntarily and intelligently'" elect to conduct his own defense, and most courts require him to do so in a timely manner.... A trial judge may also terminate self-representation or appoint "standby counsel"even over the defendant's objectionif necessary.... Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal "chores" for the defendant that counsel would normally carry out. Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.
528 U.S. at 162, 120 S.Ct. 684 (internal citations omitted).
An accused has the right to chose between the right to counsel and the right to self-representation. State v. Strain, 585 So.2d 540, 542 (La.1991). An accused, however, will be held to have forfeited the right to self-representation if he vacillates between self-representation and representation by counsel. United States v. Bennett, 539 F.2d 45, 51 (10th Cir.1976); United States v. Frazier-El, 204 F.3d 553 (4th Cir.), cert. denied, 531 U.S. 994, 121 S.Ct. 487, 148 L.Ed.2d 459 (2000). In light of the fundamental significance attached to the right to counsel, the jurisprudence has engrafted a requirement that the assertion of the right to self-representation must be clear and unequivocal. See 3 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, Criminal Procedure § 11.3(a)(2nd ed. 1999)(noting courts should "`indulge in every reasonable presumption against waiver'"); Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); State v. Hegwood, 345 So.2d 1179, 1181-82 (La.1977). Requests which vacillate between self-representation and representation by counsel are equivocable. Bennett, supra.
Whether the defendant has knowingly, intelligently, and unequivocably asserted the right to self-representation must be determined based on the facts and circumstances of each case. See State v. Strain, 585 So.2d 540, 542 (La.1991)(citing Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).
Turning to the instant case, we find no merit in defendant's procedural contention that the trial court applied the wrong standard by focusing on his lack of legal experience and no merit in his substantive *895 contention that his request to represent himself was unequivocable.
Procedurally, the trial judge's reasoning, taken as a whole, evidences that he applied the correct legal standard; specifically he stated:
Well, it's obvious to me that to waive counsel is not in Mr. Bridgewater's best interest. He would not know what he was doing in the conducting of a trial. He has very little legal experience, if any, and I don't believe that the choice would behe would make would be a knowing, intelligent choice being made with his eyes open. So I'm going to deny him his right to or deny the right, his motion to represent himself. (Emphasis supplied).
We are satisfied that the trial judge properly focused on defendant's lack of a "knowing, intelligent choice" as his basis for denying the motion. See Frazier El, supra (rejecting similar argument that district court legally erred in focusing on defendant's competence to represent himself).
Substantively, defendant's request to represent himself was not an unequivocal one; rather, it was an obfuscated request to substitute appointed counsel because of his disagreement with current counsel's choice of trial strategy. Addressing a similar request, the federal court in Frazier-El, supra, reasoned:
A trial court must be permitted to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel. The circumstances surrounding Frazier-El's purported waiver of his right to counsel and the assertion of his right to proceed without counsel in this case suggest more a manipulation of the system than an unequivocal desire to invoke his right of self-representation. Taking the record as a whole, we are satisfied that the district court was justified, when confronted with Frazier-El's vacillation between his request for substitute counsel and his request for self-representation, in insisting that Frazier-El proceed with appointed counsel.
204 F.3d at 560 (internal citations omitted).
Although the defendant argues that this Court's decision in State v. Santos, 99-1897 (La.9/15/00), 770 So.2d 319, is controlling, that case is easily distinguishable. In Santos, supra, the defendant made an unequivocal request to discharge his court-appointed counsel and to represent himself, explaining that he feared "`the Indigent Defender Board is working with the police of St. Bernard Parish to keep me here.'" 99-1897 at p. 3, 770 So.2d at 321. Unlike the defendant in Santos who was convinced that no public defender could serve his interests, in this case defendant specifically stated that it was current counsel with whom he was dissatisfied. Two other factors we relied upon in Santos were that the defendant (i) unequivocally asserted his right to represent himself, and (ii) made that request "under circumstances which precluded a finding that he was simply engaged in dilatory tactics." 99-1897 at p. 4, 770 So.2d at 322. Neither factor is present here.
First, defendant's request was not clear and unequivocal; rather, defendant's request was, like in Frazier-El, supra, "a manipulative effort to present particular arguments" and vacillated between self-representation and representation by counsel. Second, given that defendant raised similar arguments before (a point discussed below) and that he sought a continuance on the eve of trial, this clearly could be characterized as a "dilatory tactic."

(iii) defendant's strategic conflict with appointed counsel.
Defendant claims that the trial court erred in denying his attorney's motion to *896 withdraw four days before trial "based on irreconcilable conflicts between [himself] and Mr. Bridgewater." At a pre-trial, ex parte, sealed hearing, defense counsel clarified that the conflict arose out of defendant's wish to present a defense of total innocence and counsel's recommendation that defendant admit to second degree murder and argue that the requisite specific intent needed to prove first degree murder was lacking.
As a general proposition, a criminal defendant has the right to counsel of his choice. State v. Leggett, 363 So.2d 434, 436 (La.1978); State v. Mackie, 352 So.2d 1297, 1300 (La.1977); State v. Anthony, 347 So.2d 483, 487 (La.1977). This right, however, is the flip-side of the right to self-representation. Like self-representation, this right cannot be manipulated to obstruct orderly court procedure or to interfere with the fair administration of justice.[20] "Defendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner and at an appropriate stage of the proceedings." State v. Seiss, 428 So.2d 444, 447 (La.1983). Absent a justifiable basis, "[t]here is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications." State v. Leggett, 363 So.2d at 436. A trial court's ruling on this issue will not be disturbed in the absence of a clear showing of abuse of discretion. State v. Cousin, 307 So.2d 326, 328 (La.1975).
In the instant case, defendant voiced the same strategic conflict with prior counsel, Armato, as he had with his trial counsel, Dohre. Given that this was (as the state suggests) becoming a "pattern," that defendant had already gone through two other attorneys, and that this capital murder trial was scheduled to begin in just four days, we cannot say that the trial court abused its discretion by denying defense counsel's motion to withdraw.

Batson challenges
Defendant claims that the state systematically excluded African Americans from the jury by striking the only two African-Americans qualified for the petit jury, resulting in defendant, an African-American, being tried by a jury of all Caucasian-Americans.[21]
In its simplest statement, the Batson analysis is as follows:
[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination.
Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71, 131 L.Ed.2d 834, 839 (1995). While the state counters that defendant failed to even satisfy step one, the state's voluntary articulation of race-neutral explanations (step two) mooted the *897 issue of whether defendant satisfied the prima facie case requirement (step one). State v. Green, 94-0887 at p. 25 (La.5/22/95), 655 So.2d 272, 288. This case thus involves only step threewhether defendant proved purposeful discrimination. In finding defendant failed to do so, the trial court did not err.
The state's reasons for challenging both African-American jurors, Ms. Campbell and Ms. Black, were race-neutral. The record reveals that the prosecutor, in response to the defense's Batson challenge, voluntarily articulated the following reasons for striking these two prospective jurors:
[Ms. Black was] the lady who indicated that she had some acquaintance with the defendant's father, stopped and spoke with him as she left court the other day. Had a smiling, very friendly conversation with him. It was apparent she knew him in some capacity. She indicated she knew him from working downtown years ago.
As to Ms. Campbell, the reason we cut her, contrary to Mr. Dohre's opinion that she is a good State juror, she's indicated she's a security officer. The State has a habit of never keeping anybody in law enforcement or in any type of security....
Also, we believe that with a brother that was dead, that could cut both ways. I don't know that that's necessarily favorable to the State if, in fact, the person who murdered her brother was not sentenced to death, she might feel that no one deserves to be. And we had some concerns about that, felt like it could go both ways, so for those two reasons, we cut Ms. Campbell.
Defendant countered that there were two other prospective Caucasian-American jurors who had people murdered in their family, but whom the state accepted. Defendant's counter argument is without merit, factually and legally. Factually, neither of those other jurors remained on the jury; the state could have used their backstrikes on them had the defense not excused them. Legally, this court rejected a similar argument in State v. Taylor, 99-1311 at p. 5 (La.1/17/01), 781 So.2d 1205, 1212, stating that "although the voir dire responses of [the striken] prospective juror Porter are not markedly different from other venire-persons who actually sat on the jury, the defendant fails to show that the trial court erred when it accepted the state's race-neutral explanation for the strike." Id. The trial court thus correctly concluded that defendant failed to prove purposeful discrimination.

TRIAL PHASE ISSUES
We have grouped defendant's remaining assignments of error pertaining to the trial proceeding into three broad categories: (i) mistrial motions, (ii) incomplete record, and (iii) prosecutorial misconduct. We address each of these categories.

(i) Mistrial Motions
Defendant argues that the trial court erroneously denied several motions for mistrial lodged during the trial. Keeping in mind the general principles that mistrial is a drastic remedy warranted only when substantial prejudice implicates the fairness of trial and that the trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial,[22] we address each of these motions defendant reurges.

*898 (a) Prejudicial Publicity

La.C.Cr.P. art. 775 requires a mistrial when "prejudicial conduct in or outside the courtroom makes it impossible for the defendant to receive a fair trial." (Emphasis supplied). Prejudicial conduct may include pretrial or midtrial publicity about the case. State v. Russell, 416 So.2d 1283, 1290(La.), cert. denied, 459 U.S. 974, 103 S.Ct. 309, 74 L.Ed.2d 288 (1982). A mistrial "is not warranted absent a determination that the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict." Russell, 416 So.2d at 1290.[23]
In this case, the prejudicial conduct defendant relies upon is an article that appeared in the Times-Picayune on the second day of jury selection. The article reported that defendant and Jacobs both admitted they were at the crime scene, but each one accused the other of being the shooter. Defendant contends that this article resulted in prejudicial publicity; more precisely, he contends that it "tainted the entire jury panel and appropriate measures were not taken to ensure that prospective jurors, particularly those qualified the previous day" were not tainted by this prejudicial publicity. Contrary to defendant's contention, we find the measures taken by the trial court were sufficient to ensure the publicity did not taint the jury.[24]

(b) Defendant's outburst
Defense counsel moved for a mistrial immediately after an outburst by defendant that occurred at the end of the state's closing arguments. Particularly, the outburst occurred as the prosecutor, Ms. Morgan, completed her rebuttal closing argument, and the following exchange took place:
DEFENDANT: Before you sit down, Ms. MorganI want to say(Attorneys urge the defendant to keep quiet.)
COURT: Let's remove the jury from the court.
JURY EXITS COURTROOM
(While the jury is exiting the courtroom, the defendant starts to speak again).
DEFENDANT: I still want to say
(Attorneys and deputies tell the defendant to keep quiet.)
DEFENDANT:that Jacobs was convicted of this crime. If I'm the killer, why was he convicted of this damn *899 crime already, Ms. Morgan? That's what I want to know.
THE DEPUTIES RESTRAIN THE DEFENDANT FROM SAYING ANYTHING FURTHER AND REMOVE HIM FROM THE COURTROOM.
In denying defendant's mistrial motion, the trial judge admonished defendant that if he was unable to keep quiet, the court would have him gagged; admonished Ms. Morgan regarding her comments that apparently provoked this outburst; and admonished the jury, instructing them that: "it's been a long and stressful day and I need to instruct you to disregard Mr. Bridgewater's comments."
Defendant argues that the prosecutor's improper closing argument provoked his outburst and the ensuing prejudice and that the trial judge's admonishment was insufficient to cure the error. The state counters that defendant's outburst was a deliberate and calculated move from which he should get no benefit. We agree. As former Justice Tate aptly stated in State v. Wiggins, 337 So.2d 1172, 1173 (La.1976), "[a] defendant cannot complain that prejudicial conduct requires a mistrial, when the alleged prejudice was created by his own obstructive conduct met by a reasoned and ordered reaction by the trial court in the interest of maintaining orderly procedure in the courtroom." Id.; State v. Shank, 448 So.2d 654, 658 (La.1984)("defendant is [not] entitled to a new trial because his first was tainted with prejudice caused by his own conduct.").[25]

(c) Improper indirect references to defendant's failure to testify
La.C.Cr.P. art. 770(3) provides that the trial court "shall" declare a mistrial when the prosecutor "refers directly or indirectly" to "[t]he failure of the defendant to testify in his own defense." (Emphasis supplied). When the challenged reference is indirect, the court must inquire into the remark's "intended effect on the jury" so as to distinguish between impermissible indirect reference to the defendant's failure to testify and permissible general statements that the prosecution's case was unrebutted. State v. Johnson, 541 So.2d 818, 822 (La.1989). "In cases where the prosecutor simply emphasized that the state's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so, the prosecutor's argument does not constitute an indirect reference to the defendant's failure to take the stand." Id. at 822-23; State v. Smith, 433 So.2d 688, 694-95 (La. 1983) (prosecutor's comments allegedly directed to defendant's failure to testify actually related to lack of evidence).
In this case, the prosecutor's reference to defendant's quiet demeanor did not refer to his failure to testify; instead, these references were intended to rebut defendant's claim that his co-defendant-Jacobs, and only his co-defendant, had the necessary specific intent to kill. Accordingly, the comment was within the bounds of proper closing argument and did *900 not warrant a mistrial. Likewise, despite appellate counsel's creative attempt to frame the prosecutor's closing arguments about defendant's lack of remorse as an indirect reference to defendant's failure to testify, at most, the comments regarding defendant's lack of remorse reflect impermissible closing argument. Regardless, defense counsel's failure to object waived this issue on appeal. La.C.Cr.P. art. 841.

(d) Improper other crimes evidence
La.C.Cr.P. art. 770(2) mandates a mistrial "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to ... [a]nother crime committed or alleged to have been committed by the defendant as to which evidence is not admissible." Unsolicited and unresponsive testimony, however, is not chargeable against the state to provide a ground for mandatory reversal of a conviction.[26]
Defendant contends that impermissible other crimes evidence was improperly admitted when the state played a portion of the tape recording of Ms. Menard's 911 call; specifically, defendant objects to her remark that "two [unidentified] blacks had committed some robberies in the area." Defendant stresses that the state agreed to excise this information from the tape before playing it in front of the jury. This unsolicited remark inadvertently left in the 911 tape is not a grounds for a mandatory mistrial under La.C.Cr.P. art. 770(2); rather, this oblique and ambiguous reference falls under La.C.Cr.P. art. 771, which provides for a discretionary mistrial when a witness' prejudicial remarks render it impossible for the defendant to obtain a fair trial. State v. Smith, 418 So.2d 515, 522 (La.1982); State v. Prudholm, 446 So.2d 729, 741 (La.1984). Such is not the case here. Ms. Menard's remark did not refer to any specific crime committed by defendant; she merely referenced her personal knowledge of recent robberies committed in her neighborhood by two unidentified African-American males.

(e) Improper reference to co-defendant's statement
Defendant cites the testimony of the lead investigator, Detective Maggie Snow, regarding co-defendant-Jacobs' statement to police as a basis for a mistrial. Particularly, defendant quotes the following exchange:
STATE: During your investigation, were you ever able to formulate who the shooter was?
WITNESS: No, I was not. Neither one during any time of the investigation admitted to being the trigger man.
Defense counsel objected to this exchange and moved for a mistrial, arguing that the prosecutor was "comment[ing improperly] about what the other guy didn't say" and that "[t]he jury shouldn't be told that the other guy didn't make a statement saying that he was the shooter." Defendant adds that the prosecutor's extensive voir dire on the "buddy system" of committing crimes made this exchange particularly prejudicial.
*901 Even assuming this reference to Jacobs' statement was inadmissible hearsay, the jurors knew that defendant and Jacobs were being separately tried for this double homicide. Furthermore, the "finger pointing" substance of Jacobs' statement was not the crux of the state's case; rather, as discussed earlier, the state's case centered on the assumption that Jacobs was the shooter, and defendant was a principal. Admitting this statement was thus, at best, harmless error. See State v. Wille, 559 So.2d 1321, 1332 (La.1990)(admitting hearsay evidence which is merely corroborative and cumulative of other properly introduced evidence is harmless).[27]

(ii) incomplete record
La. Const. Art. I, § 19 guarantees an accused the right to an appeal based on a complete record. Although this Court has found reversible error when material portions of the trial record were unavailable or incomplete, we have declined to reverse an accused's conviction based on "[a] slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal." State v. Ford, 338 So.2d 107, 110 (La.1976); see also State v. Parker, 361 So.2d 226, 227 (La.1978). Moreover, a defendant is not entitled to relief based on an incomplete record absent a showing of prejudice resulting from the missing portions of the transcripts. State v. Castleberry, 98-1388 at p. 29 (La.4/13/99), 758 So.2d 749, 773, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999) (holding no reversible error given defendant failed to show prejudice resulting from bench conferences not being transcribed).
Defendant contends that the record is incomplete in that it lacks, among other things, the following: (a) the bench conference on jury charges, (b) the jury's note, and (c) the discussions regarding books and movies for the jury.[28]

(a) the bench conference on jury charges
Defendant argues that the lack of a transcript of the critical bench conference on jury charges precluded his appellate counsel from determining whether his trial counsel lodged any objections to the court's instructions. Given that none of defendant's claims regarding jury instructions had any merits,[29] the omitted portion of the record was not material.

*902 (b) the jury's note

Defendant argues that the trial court erred when it answered a jury question outside his presence. This issue arose after the jury returned its guilt verdict. At that point, defense counsel informed the trial judge that, according to defendant's family, the jury had asked a question or wanted an instruction during deliberations. Without responding, the court polled the jury and then stated: "[t]his is the note that the jury knocked and said that can we have a copy of the judge's instructions to the jury and I instructed the bailiff to tell them no, they couldn't have anything written in the jury room." Objecting, defense counsel argued that the fact the jury requested written instructions could be construed to mean they needed some instruction. Defendant thus contends that the trial judge's failure to bring the jury back into the courtroom constituted reversible error under La.C.Cr.P. art. 808.[30]
The better practice would have been to bring the jury back and to instruct them that no written materials are allowed in the jury room. However, since the jury did not ask to be re-instructed, we do not find the trial judge's actions were erroneous.
While the actual note is not in the record, its contents are clear from the record. Reading the note aloud, the trial judge stated on the record that "[i]t's pretty straight forward; [the note asks] `Can we have a copy of the judge's instructions to the jury?'" This omission is thus immaterial.

(c) The books and movies for the jury
The absence from the transcript of the discussions regarding which books and movies would be allowed for the sequestered jury clearly constitutes an "inconsequential omission" to the proper determination of defendant's appeal. Ford, 338 So.2d at 110.

(iii) Prosecutorial Misconduct
La.C.Cr.P. art. 774 provides that the scope of argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact which each side may draw, and to the law applicable to the case; argument shall not appeal to prejudice. Nonetheless, this court will not reverse a conviction if not "thoroughly convinced" that the improper closing argument influenced the jury and contributed to the verdict.[31] Even when the prosecutor's statements and actions are excessive and improper, credit should be accorded to the good sense and fair-mindedness of the jurors who have seen the evidence and heard the arguments. State v. Kyles, 513 So.2d 265, 276 (La.1987).
In the instant case, defendant argues that the prosecutor's closing arguments violated La.C.Cr.P. art. 774 in five respects.
First, defendant argues that the prosecutor's disparaging remarks about defense counsel during voir dire and closing *903 argument were improper.[32] While prosecutors should refrain from personal attacks on defense strategy and counsel, a comment that suggests the state carried its burden despite defense attempts to show otherwise, even if improper, is not reversible error. See State v. Brumfield, 96-2667 at p. 4 (La.10/20/98), 737 So.2d 660, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999); State v. Lucky, 96-1687 at p. 22 (La.4/13/99), 755 So.2d 845, 858, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000).
Second, defendant complains that the prosecutor characterized him as a "cold-blooded killer" and an "animal." The state clarified that the latter characterization was a comparison of defendant to "an animal looking for prey," and further replied that these were accurate characterizations. We have held that characterizing a defendant as an animal, while ill-considered, is not reversible error. State v. Gray, 351 So.2d 448, 460 (La.1977).
Third, defendant contends that the prosecutor misstated the law by telling jurors that they had to acquit of first degree murder before they could consider the responsive verdicts. Misstatements of law by the district attorney during argument do not give rise to reversible error when the trial court properly instructs the jury at the close of the case. State v. Cavazos, 610 So.2d 127, 128-29 (La.1992); State v. Brogdon, 457 So.2d 616, 630 (La. 1984). Assuming this statement was an incorrect characterization of the applicable law,[33] any prejudice was cured by the trial judge's jury charges, which included proper instructions regarding the responsive verdicts to first degree murder.
Fourth, defendant contends that the prosecutor improperly appealed to prejudice by playing the tape recording of Ms. William's 911 call for a third time and by displaying gruesome photographs of the victims. Given that both the 911 tape and the photographs were properly *904 admitted at trial,[34] the prosecutor's displaying the pictures and playing the tape were within the scope of proper argument as defined by La.C.Cr.P. art. 774.
Finally, defendant contends that the cumulative effect of the allegedly improper statements by the prosecutor during closing argument warrants relief. In support of this contention, defendant cites the fact that following his outburst the trial judge admonished the prosecutor as demonstrating the "pervasiveness of the misconduct and the cumulative effect of the improper arguments." Defendant's reliance on that admonishment is misplaced; the trial judge was attempting to bring order to the courtroom and was not specifically admonishing the prosecutor for improper argument. Nor do we find any merit to defendant's contention that the cumulative effect of the prosecutor's improper arguments was prejudicial. See State v. Scales, 93-2003 at p. 13 (La.5/22/95); 655 So.2d 1326, 1335, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996)(rejecting similar argument). The prosecutorial misconduct defendant cites, even if outside the proper scope of closing argument, does not require relief, singularly or collectively.[35]

Decree
For the reasons assigned, we set aside defendant's first degree murder conviction and death sentence. We hereby modify the jury's verdict of guilty of first degree murder and render a judgment of guilty of second degree murder. La.C.Cr.P. art. 821(E). We remand the case to the district court for sentencing of defendant on the modified judgment to serve life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence *905 as provided for in La. R.S. 14:30.1(B).
VICTORY, J., dissents and assigns reasons.
TRAYLOR and KNOLL, JJ., dissent for reasons assigned by VICTORY, J.
VICTORY, J., dissenting.
I dissent from the majority's holding that there was insufficient evidence presented at trial to support a first degree murder conviction. In reversing the defendant's first degree murder conviction, the majority finds "merit to defendant's contention that the state failed to exclude a reasonable hypothesis of innocence; namely, that Jacobs was the sole shooter and that defendant was merely present, neither advancing nor assisting Jacobs in shooting the victims." Op. at p. 889. However, viewed in the light most favorable to the prosecution, the circumstantial evidence proved, at a minimum, that the defendant was the leader, actually participated in the armed robberies resulting in two first degree murders, knew the details of the crimes, was present with Lawrence Jacobs in the bedroom with the victims when they were shot, participated in the shootings, drove the getaway car from the scene, and had possession of all the stolen objects recovered. All of the circumstantial evidence mentioned in this dissent was argued to the jury, which unanimously found this defendant guilty of first degree murder, showing its conclusion that this defendant had specific intent to kill or inflict great bodily harm on the two murder victims.
The defendant made four inconsistent statements to the police, summarized below. All of these recorded statements were introduced into evidence and played for the jury. The first statement was taken after the defendant's picture was on television because of his involvement in the murders. He contacted the police and made a statement, denying any knowledge or involvement in the crime, and claiming he had been with a homosexual named "Mike," at the time of the murders. The defendant's first statement was clearly a complete fabrication.
In his second statement, given to the police the following day, the defendant stated that he was with Jacobs (who he claimed was armed with a .38 revolver), when they approached Mr. Beaugh outside of his house. However, he claimed that he "knew what [Jacobs] was bout to do," so he left and went home. He claimed that later, Jacobs arrived at his home with Mr. Beaugh's van and the stolen property and told him that he shot the victims. He then drove the van, with Jacobs as the passenger, to the Iberville projects, where he wiped all his prints off of the van. He also claimed that he purchased a keyboard stolen from the Beaugh's home from Jacobs. Almost all of the defendant's second statement was a fabrication.
In his third statement to the police, given minutes later, the defendant finally admitted being involved in the robbery, and gave his "story," in which he described all aspects of the crimes in great detail. He claimed Jacobs had a .38 pistol, but he had a broken BB gun. He claimed Jacobs forced Mr. Beaugh into the house with the gun, found Beaugh's mother in the kitchen and brought them into the living room. Then, after Mr. Beaugh told them there was money in his son's room, they all went into the son's room there and found money in the dresser. Although the defendant claimed he then "left" (to go to the garage to be a lookout, only occasionally "peeking in" to see what Jacobs was doing), he was able to describe how Jacobs ran through the house, first to one room, then to the computer room, and stated "we all went *906 and got the safe." Although the defendant said that Jacobs took the victims to the bedroom, the defendant told the police exactly where the victims were positioned in the bedroom, Mrs. Beaugh at the foot of the bed and her son on the side of the bed toward the middle, which is where the bodies were found. According to the defendant, when he again "peeked in," Mr. Beaugh took out the jewelry box, yet the defendant opened two drawers of the dresser, took some things out and then went back to the garage, just in time to miss the shootings. He claimed that he thought Jacobs was just going to take the phones so the victims could not call the police. At one point in the statement he claimed to have seen Jacobs pick up the phone and then put it down; at another point in the statement he claimed to have heard, from the garage, Jacobs put down the phone. In any event, according to the defendant, Jacobs told him "I ain't gonna shoot them I'm just gonna take phone [sic]" and that "He put the phone down and that's when I heard the gun shots." So, while he claimed to have seen Jacobs pick up the phone and then put it down in the bedroom, he claimed to be in the garage when the shots were fired seconds later.
In this third statement, the defendant denied that they took a camcorder, stated that he did not know what Jacobs did with the jewelry after Jacobs threw it in the van, and stated that he did not take Mr. Beaugh's watch. However, the evidence showed that the police recovered the keyboard, and Mr. Beaugh's watch and ring from the defendant's residence. In addition, the police went back to the residence on two other occasions and other female residents gave them numerous other items of jewelry taken from the Beaugh's home, including more watches, rings, broaches, necklaces and earring. In his fourth statement, again taken minutes later, he suddenly remembered that in addition to the keyboard, he also had a camcorder, and Mr. Beaugh's watch, items that he specifically denied taking in his third statement. Just as the defendant's third statement contained numerous lies about the stolen property, it was reasonable for the jury to find that his other statements, denying his guilt of the murders and placing the blame for the shootings on Jacobs, were lies.
Throughout these statements, the defendant corrected himself numerous times after he said "I" or "we" in describing the crime, indicating his personal involvement in the act, and then changed those prepositions to "he" or "Jacobs," attempting to blame Jacobs alone. For instance, when asked "How long [after you saw the victims seated on the bed], when you walked out the room," the defendant replied, "I was, he was still in there talking so it had to be bout 2 maybe hitting bout 3 minutes he was in there talking to the people." Again, in describing the events, the defendant stated, "Then the man, after we got, after Lawrence got the money off the man," and "So, after that we, he went back in the [bed]room and I peeked on them." Throughout the defendant's third statement, which he claims to be the truth, the defendant described things going on inside the house, including events immediately before the shooting, that could only be known by someone inside the room where the events were taking place. The defendant's silly explanation that he "peeked in" from time to time was simply unbelievable to the jury. Even more incredulous was the defendant's story that he followed Jacobs into the son's bedroom to get money out his room in order "to watch out." There would be no need to be a lookout inside the garage, much less inside the house. Thus, the jury properly concluded the defendant was in fact inside the room with Jacobs when the shootings took place. *907 The jury heard these recorded statements and could judge for itself whether the defendant was ever telling the truth. The jury discredited the defendant's final "story," that he was near the garage while Jacobs unexpectedly shot the victims, in light of the constant web of lies contained in his statements. Not only should defendant's "story" be given no credence on that basis, but his "story" that he was a serving as a lookout from the garage is not reasonable, as there was no explanation proffered as to why a "lookout" would place himself in a garage. It was obvious to the jury that the defendant was a liar, and therefore it did not believe his "story."
In addition to the above evidence, other circumstantial evidence, taken as a whole, and seen in a light most favorable to the prosecution, proves that the defendant was a principal in the shooting. The majority emphasizes that there was no evidence that the defendant was armed, and thereby no specific intent, relying on Mrs. Menard's statement that she observed no weapons on either man. Op. at p. 891. However, she stated that the defendant was fidgeting with the waistband of his pants, indicating the presence of a weapon. Further, the defendant admitted he was armed, though he claims it was with a harmless broken BB gun. This is not a "concession" by the defendant, but part of his self-serving "story," which was clearly rejected by the jury for several valid reasons.. If he really did have a BB gun, why did he get rid of it after the shootings? If it was not used to kill, why discard it? The admission by the defendant that he was armed was accepted by the jury, but it rationally chose to reject his denial that it was a real gun. This circumstantial evidence reasonably led the jury to conclude he had a real gun, used it to kill, and discarded it because it would incriminate him.
Second, if the defendant was not one of the shooters, why did he get rid of his shirt shortly after the crime? It was reasonable for the jury to conclude, as argued by the state, that it was because the shirt may have been blood-spattered from shooting the victims at close range.
Third, although the state expert witnesses, forensic pathologist Dr. Susan Garcia, and firearms examiner Capt. Louise Walzer, could not say definitively how many guns were used to kill the two victims, Capt. Walzer did testify that different kinds of .38 ammunition were used, suggesting that more than one gun was used and that both defendants fired shots.
Fourth, the crime scene photographs and the testimony of Dr. Garcia regarding the position of the wounds suggest that both men fired the shots. Mr. Beaugh was shot three times as he sat on the bed, once through the right cheek from only one inch away, once above the left ear from two-four inches away, and once in the left shoulder. Mrs. Beaugh was shot once behind her right ear as she knelt at the foot of the bed. This evidence and the bullets tradjectories are consistent with two shooters, one standing at the foot of the bed and one standing to the right of the bed.
Fifth, while the defendant claimed in his third statement that he was scared of Jacobs, he drove from the Beaugh house with Jacobs in the van, then drove him to the Iberville project, where, together, they dumped the stolen van shortly after the murders. They then played video games and ate together. The next night they went to a party together. Aside from showing that he was acting in concert with Jacobs all along, from before the crimes to long after the crimes, this evidence shows he was not scared of Jacobs. If he really did not know Jacobs was going to kill the victims and was scared Jacobs was going *908 to kill him too, why didn't he report Jacobs to the police or at least get away from Jacobs? The reason is obvious, he was also a shooter.
Sixth, much of the evidence showed that not only was the defendant one of the shooters, he was the leader, in charge of the events of the day. All of the property that was taken from Mr. Beaugh's home that was recovered was found in the custody of the defendant, not Jacobs, including Mr. Beaugh's watch and ring, which Mr. Beaugh's daughter testified that he never took off, indicating that the defendant personally took it off his finger. Ms. Menard testified that the defendant was the more aggressive of the two men, the one who did all of the talking and the one that made her most afraid. Further, it was the defendant who lied to Ms. Menard, first stating that they were looking for someone named "Derrick," then stating that they were in the neighborhood for a painting job. Ms. Menard knew these statements were untrue and she told the defendant to get out of the neighborhood and go back to school. The state argued to the jury that Ms. Menard humiliated the defendant, which made him very angry and anxious to prove his toughness to Jacobs by engaging in the robbery-murders. Finally, the defendant stated that Jacobs liked to keep cars after stealing them, and in fact wanted to keep the van, but they got rid of the van at the defendant's insistence, further indicating the defendant was in charge and the leader.
In addition, the defendant admitted that he went into the Beaugh's home with Jacobs as Jacobs held a gun to Mr. Beaugh's head and forced him into the home. Further, he claimed he heard Jacobs tell Mr. Beaugh that he better start telling him where the money was or he was going to kill them. The defendant also heard Mr. Beaugh beg that no one be shot. In light of this evidence, the defendant's claim that he did not anticipate that Jacobs might shoot the victims is incredible.
Finally, the jury could have inferred that the defendant had the specific intent and the motive to kill the victims because the victims had seen him and could later identify him had they not been killed. The defendant knew the position of the victims at death because he was there and helped kill the victims so they could not identify him. The jury heard all this evidence and gave credence to it, discrediting the defendant's self-serving rendition of the events.
Given these facts and circumstances, the jury properly concluded from the circumstantial evidence that the defendant possessed the requisite specific intent to kill, and that the defendant's claim of innocence, contained in his third statement, was unreasonable and just more lies to cover himself. When viewed in the light most favorable to the prosecution, the jury properly concluded beyond a reasonable doubt that the defendant's participation in these murders was major, and that he either shot one or both of the victims, or at the very least, specifically intended that they be killed. The jury rejected as unreasonable the defendant's silly tale that he was merely present as a lookout in the garage, and did not participate in their murders.[1] Considering that the defendant's *909 claim (hypothesis) of innocence, as given in his third statement, is unreasonable and demonstrably false by other of the defendant's admissions and other circumstantial evidence, this Court should not upset the jury's verdict.
For all of the above reasons, I respectfully dissent.

ON REHEARING
CALOGERO, C.J.
On January 15, 2002, a majority of this Court determined that the evidence against Roy Bridgewater was insufficient to support the jury's finding of first degree murder, but sufficient, only, to support a second degree murder conviction. We granted rehearing to reconsider the State's contention that the evidence presented at the trial of Roy Bridgewater was sufficient for the jury to convict him of first degree murder and impose a penalty of death by lethal injection. Upon further review, we agree with the State. The evidence presented at trial was sufficient for a rational trier of fact to determine that Roy Bridgewater did commit the crime of first degree murder in violation of La.Rev.Stat. 14:30. Additionally, we find no error in defendant's other assignments which would warrant a reversal of the conviction or penalty imposed by the jury.[1]

LAW AND ANALYSIS

Sufficiency of the Evidence
In his appeal, the defendant argued that the evidence was insufficient to convict him of first degree murder because there was no direct evidence that he fired a gun or that he was present when the shots were fired, and that the circumstantial evidence presented by the State did not exclude every reasonable hypothesis of innocence. This Court, on our original hearing, determined that the evidence was insufficient to support a first degree murder conviction, but was sufficient to support a conviction for second degree murder because defendant conceded that he entered the Beaugh residence with the specific intent to commit an aggravated burglary, and a killing did take place during the aggravated burglary. We now reverse that ruling and determine that the evidence submitted to the jury was sufficient to support a finding that defendant had specific intent to kill or inflict great bodily harm and, hence, defendant was appropriately found guilty of first degree murder by the jury before which he was tried.
As expressed in the original opinion, "in reviewing the sufficiency of evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). When circumstantial evidence is used to prove the commission of the offense, La.Rev.Stat. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable *910 hypothesis of innocence." The circumstantial evidence rule is not a separate test from the Jackson standard but "provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found defendant guilt beyond a reasonable doubt." State v. Wright, 445 So.2d 1198, 1201 (La.1984).
In the instant case, the State alleged that defendant was guilty of first degree murder because (1) he had specific intent to kill or to inflict great bodily harm and was engaged in the perpetration of an aggravated burglary and/or armed robbery, La. R.S. 14:30(A)(1); (2) that he had a specific intent to kill or to inflict great bodily harm upon more than one person, La. Rev. 14:30(A)(3); or (3) that the offender had the specific intent to kill or to inflict great bodily harm upon a victim who was sixty-five years of age or older, R.S. 14:30(A)(5).
We note that specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La.Rev.Stat. 14:10(1); State v. Butler, 322 So.2d 189, 192-93 (La. 1975). Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Sullivan, 596 So.2d 177, 190 (La.1992). In addition, the State also charged defendant as a principal, for having acted in concert with Lawrence Jacobs. As such, the State had to demonstrate that defendant had the requisite specific intent, not merely that he knew of Jacob's intentions, in the event the jury concluded that Jacobs alone shot the victims.
The evidence introduced by the state, viewed in the light most favorable to the prosecution, was sufficient to prove that Roy Bridgewater was a shooter, or at the very minimum, that he had specific intent to kill or inflict great bodily harm on Della and Nelson Beaugh. The most compelling evidence came from the defendant's own statements to police.
First, in his taped confession, Roy Bridgewater is able to describe all of the events that transpired prior to Nelson and Della Beaugh's being killed. First, he states that he and Jacobs approached Nelson Beaugh while the victim was outside in his yard. Mr. Beaugh was forced into the house, causing the victim's hat to fall off in the garage. Then, Nelson Beaugh was walked through the house to the kitchen where his mother, Della Beaugh, was cooking. At that point the defendant and Lawrence Jacobs noticed the Beaugh family dog, and the victims were told to get the dog out of the house.
Next, according to the taped confession, both victims were brought to the living room and were asked to provide money. Nelson Beaugh gave what he had and then stated that money would be found in his son's room. At this point, defendant and Jacobs brought the two victims into the son's room. Nelson Beaugh swept everything off the dresser and some money fell to the floor. Then, Nelson Beaugh looked through the items on the bed and on the floor to show Jacobs and the defendant that there was no more money.
Then, defendant describes in his confession how Jacobs ran through the house. First, Jacobs went to the other child's bedroom. Then, Jacobs went into the computer room. At that point, Nelson Beaugh stated that there was a safe in the house, whereupon the defendant and Jacobs had the victims retrieve the safe. Nelson opened the safe and everyone went back into the master bedroom where the victims were forced to sit on the bed. Nelson Beaugh then opened the jewelry box and Roy Bridgewater took out the *911 first drawer and put it on the wicker hamper located near the bathroom. Then, the defendant and Lawrence Jacobs opened up the other jewelry drawers.
At this point, the recorded confession reflects that Jacobs asked the victims whether they would call the police after he and Roy Bridgewater left. Nelson Beaugh stated he would not call the police and asked Jacobs to take the phones with him. Della Beaugh just sat on the bed asking "oh my god what's going on?" Then, Nelson Beaugh gave Jacobs the keys to the family van. Jacobs next picked up the phone and put it back down. Thereupon, the victims were shot and killed. Then Jacobs grabbed a keyboard located near one of the children's rooms, and ran out of the house, through the garage to the van. According to the confession of defendant, Roy Bridgewater, he and Jacobs then drove the Beaugh van to the Iberville housing project.
Roy Bridgewater's knowledge of the exact details of what transpired in the house, where the victims were located in the bedroom, where the property was stolen, what the victims said, and importantly, where the victims were when they were killed leads to the reasonable inference that he was in the room when the victims were shot. The defendant's self serving statement that he was serving as a lookout, peeking in from time to time, and located in the garage when the victims were killed, is simply unbelievable, as the jury surely concluded.
First, the defendant could not have known the details that he described in his taped confession if he had been a lookout in the garage during most of the event.
Second, the layout of the home and the positioning of the garage doors would have greatly restricted, if not altogether prevented, defendant from being able to watch the street from the garage where he claims to have served as a lookout. In his taped confession, defendant claims that he was located in the northwest corner of the garage near the entranceway into the home, near the door that leads into the house, by the washer and dryer. If defendant was in fact standing where he claimed to be standing, he would have had no view of either garage door because his view would have been blocked by the enclosed stairwell leading to the children's playroom.[2]
Third, even if defendant could have seen beyond the enclosed stairwell from where he was standing, such a position would have been little aid to a lookout. The garage door closest to the corner of Fay Street and Cedar Lawn Drive was closed[3]. The garage door that was open faced the side of Fay Street and was bounded by a wooded area.[4] Furthermore, *912 Nelson Beaugh's truck was parked outside of that door blocking the view.[5] It appears unlikely that a lookout would be canvassing the street from a garage with only one door open, that had the view blocked by a pickup truck and which faced a wooded area.
Fourth, there are approximately fifty feet and three hallways between the area of the garage where Roy Bridgewater claims to have been standing as a lookout and the night stand where he allegedly heard Jacobs pick up and put down the phone prior to shooting the victims.[6] It is unlikely that Roy Bridgewater could have heard Jacobs pick up or put down a phone from that distance.
Fifth, if defendant was actually in the garage at the time the victims were killed and never re-entered the home, it is impossible for him to know that Jacobs ran to the hallway outside the children's rooms to retrieve a keyboard after the victims were shot. The victims were killed in the master bedroom on the far east side of the home. The hallway outside of the children's room is located on the far west side of the home.[7] If Jacobs ran from the master bedroom to the hallway outside of the children's room after the shooting, he would have had to traverse the entire house. If defendant was in the garage and never re-entered the home, it would be impossible for him to know what Jacobs did in the Beaugh home after the shooting. These factors lead to the rational conclusion that the defendant was not in the garage where he claims to have been but was, in fact, in the room where the victims were murdered.
It is rational for the jurors to have believed that the defendant, having been in the room when the victims were killed, intended to kill or inflict great bodily harm. In our opinion, it is also rational for the jurors to have believed that defendant himself was a shooter. Defendant stated in his taped confession that he was armed only with a broken BB gun. Yet, defendant could not provide the police with any corroboration for that assertion. The defendant asserted in his taped confession that he happened to find the BB gun at a canal but after the murders it was never discovered. Bridgewater claims to have thrown it out of the window of the Beaugh family van after fleeing from the scene of the crime. Despite defendant's assertions that he had only a BB gun, the testimony of Captain Louise Walzer, a forensic firearms examiner at the Jefferson Parish Sheriff's Office, casts doubt on that assertion. Captain Walzer stated that two different types of bullets were fired into the victims.
*913 While the presence of two different bullets in the bodies of the victims does not necessarily prove two different guns were used, it does allow a jury to begin drawing that inference. However, the state presented further evidence. The state showed that defendant was evasive about the location of the shirt he was wearing the day Nelson and Della Beaugh were killed. Originally, the defendant claimed that he was wearing a white t-shirt. Then, he changed his story indicating that he was in fact wearing a black t-shirt belonging to Lawrence Jacobs. Defendant stated he no longer had the shirt, having returned it to Lawrence Jacobs.
The jury could have rationally believed that the reason defendant would not produce the shirt was because it had blood on it. The autopsy photos and the testimony of Dr. Susan Garcia indicate that all four gunshot wounds to the victims were fired at close range. It is rational for a jury to believe that a killing in that manner would result in blood being deposited on the gunman's clothing and that Roy Bridgewater was in the room where the victims were shot and pulled the trigger.
But, besides the reasonable inference that Bridgewater was a gunman, there is other evidence sufficient to convince a rational trier of fact that defendant had specific intent to kill or inflict great bodily harm.
First, the facts show that defendant knew that Nelson and Della Beaugh would be killed. In his taped confessions to the police, Roy Bridgewater states that he heard Lawrence Jacobs tell the victims that he would shoot them. According to the defendant's taped confession, once Lawrence Jacobs brought Della and Nelson Beaugh into the living room, Jacobs asked for money. Nelson Beaugh stated he did not have much money and at that point Jacobs stated "man you better start talking I'm getting tired. I'm about to shoot you." This statement by Jacobs would have occurred just as the men were entering the Beaugh family home, prior to any property being taken. The defendant admits hearing Jacobs undeniably threaten to shoot the victims from the outset, yet defendant continued to aid Jacobs. The defendant admits to have aided Jacobs in searching the home and in periodically keeping watch over the victims while their property was being stolen.
In addition, defendant's taped confession indicates that he knew that Jacobs would kill the victims. During his confession to the police, the defendant talked about other instances where Jacobs had robbed people. Roy Bridgewater discussed a specific event where Jacobs entered a man's home and stole the victim's truck. Bridgewater stated that the victim in that robbery was cooperative, yet defendant was "surprised [Jacobs] didn't shoot him." If Bridgewater was surprised that Jacobs allowed a single cooperative victim to survive in a prior robbery, it is not unreasonable for the jury to believe that Bridgewater believed Jacobs would kill Nelson and Della Beaugh after burglarizing the residence. The defendant's decision to accompany Jacobs into the Beaugh family home nonetheless, evidences that Bridgewater shared Jacob's intent, even if it were assumed that Bridgewater, himself, did not shoot the victims.
Second, the actions taken by defendant after Nelson and Della Beaugh were shot are inconsistent with someone who did not intend that they be killed. Defendant admitted in his taped confession that after Nelson and Della Beaugh were killed, he and Lawrence Jacobs took the Beaugh van, then abandoned it. Then the two went to McDonalds to eat. Defendant even recalls the exact meal he consumed. Then, he and Jacobs went to a video arcade. *914 The next night, they went to a party together. Furthermore, cell phone records show that a call was placed from the Beaugh van to the girlfriend of Roy Bridgewater's brother. Additionally, the defendant admitted sharing in the stolen property. Bridgewater admitted that he took possession of the Nelson Beaugh's watch and a keyboard that was taken from the Beaugh home. Bridgewater told the police that the stolen property was located at his girlfriend's house, and the police were able to retrieve the items from the designated residence. Subsequently, other property of the Beaugh family was recovered from the home of Bridgewater's girlfriend as well.
Defendant's claims that he was scared because Jacobs was armed and that Jacobs might shoot him, if that were believed by the jury, could reasonably explain why defendant would have left the scene with Jacobs driving the Nelson Beaugh's van to facilitate escape. But if defendant was concerned for his own safety and did not intend for the Nelson and Della Beaugh to be killed, it is not logical that (1) defendant would voluntarily go to eat with Jacobs after the killings; (2) voluntarily accompany Jacobs to a public video arcade; (3) voluntarily go with Jacobs to a party the day after the killings; and (4) share in the stolen property.
The jury was presented evidence that defendant had specific intent to kill or inflict great bodily harm on Nelson and Della Beaugh. Jacobs from the outset threatened to shoot the victims; defendant admitted he was surprised Jacobs had not killed a robbery victim in a prior crime; despite knowing Jacob's disposition, defendant aided him in keeping the victims at bay and stealing their property; after the killings defendant remained with Jacobs, eating with him, playing video games and going to a party; finally, defendant shared in the stolen property. All of this was presented to the jury. Taking these facts in the light most favorable to the prosecution, we cannot say that they were insufficient to convince a rational trier of fact that the element of specific intent was proven. Thus, the evidence was sufficient to prove that defendant himself was a gunman or, at the very least, had an active desire that Lawrence Jacobs kill the victims. Hence, the jury did not err in finding defendant guilty of first degree murder[8].
Defendant's remaining assignments of error concern the penalty phase and defendant's death sentence. We find these remaining assignments non-meritorious and governed by settled principles of law. Hence we address them in an unpublished appendix, which is attached to this opinion and is part of the official record in this case. Because these assignments lack merit, we find no error in defendant's sentence of death.

CONCLUSION
Upon rehearing, we find that the evidence presented to the jury, in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the defendant, Roy Bridgewater, did possess specific intent to kill or inflict great bodily harm and did commit the crime of first degree murder in violation of *915 La Rev. Stat. 14:30. Furthermore, we have found no merit to defendant's assignments of error concerning the defendant's sentence of death. Hence, Roy Bridgewater's conviction and sentence are affirmed.

DECREE
FIRST DEGREE MURDER CONVICTION AND DEATH SENTENCE OF THE DEFENDANT, ROY BRIDGEWATER, IS AFFIRMED.

CAPITAL SENTENCE REVIEW ADDENDUM
Article I § 20 of the Louisiana Constitution prohibits cruel, excessive or unusual punishment. Pursuant to La. Code Crim Proc. art. 905.9 and Louisiana Supreme Court Rule 28, this Court reviews every sentence of death to determine if it is constitutionally excessive. In making the determination the Court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings with respect to the statutory aggravating circumstances; and, whether the sentence is disproportionate considering both the offense and the offender.
Defendant, Roy Bridgewater, is an African-American male, who was 17-years-old at commission of the offense. He is one of four children born to his mother. His mother was 15 years old when defendant was born. Bridgewater's highest level of education is the 7th grade. When defendant was five years old his father was incarcerated and his mother married Bridgewater's step-father who was a strict disciplinarian.
The defendant is the father of one child, a son, who was approximately one year old at the time of trial. Defendant's contribution to the support of his son is unknown.
There are two victims, Nelson Beaugh, Caucasian male (45 years old at the time of death) and Della Beaugh, a Caucasian female (70 years old at the time of death). The victims were mother and son and the offense was committed in the home of Nelson Beaugh.
In mitigation, the defense emphasized Bridgewater's unstable family environment and defendant's age.

Passion, Prejudice or Arbitrary Factors
There is no suggestion in the record that the jury's decision was based on passion, prejudice or any other arbitrary factor.

Aggravating Circumstances
Jurors returned the following statutory aggravating circumstances: the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary; the offender knowingly created a risk of death or great bodily harm on more than one person; the offense was committed in an especially heinous, atrocious or cruel manner; and the victim was over the age of 65 years old.

Aggravated Burglary
As to the defendant being engaged in the perpetration or attempted perpetration of an aggravated burglary, the state admitted into evidence defendant's taped confessions to the police, where he admitted entering the Beaugh residence to commit an aggravated burglary. This aggravating circumstance, then, is met by defendant's own statements.

Risk of Death or Great Bodily Harm on More Than One Person
Concerning defendant's knowingly creating a risk of death or great bodily harm on more than one person, the *916 undisputed evidence shows that when defendant entered the Beaugh home both Nelson and Della Beaugh were inside. Furthermore, both victims were killed. Certainly, the death of both individuals evidences that there was a risk of death or great bodily harm to more than one person.

Heinous, Atrocious or Cruel Manner
For a crime to have been committed in an especially heinous or cruel manner, the evidence must support a finding of torture or pitiless infliction of unnecessary pain. State v. Hoffman, 768 So.2d at 574; State v. Hamilton, 92-1919, p. 15 (La.9/5/96), 681 So.2d 1217, 1226; State v. Eaton, 524 So.2d 1194, 1210 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807, rehg. denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989); State v. Brogdon, 457 So.2d 616, 631 (La.1984). To support a finding of heinousness, this court has also held that the death must have been particularly painful and carried out in an inhumane manner, so that the victim experienced great pain and was aware of his impending death. See State v. Castleberry, 758 So.2d 749.
Regarding the jury's finding that the offense was committed in an especially heinous, atrocious or cruel manner, we note that there was evidence that the victims were forced to kneel on the bed while the defendants ransacked the Beaugh home, and that both victims were shot at close range. Those facts alone, however, do not necessarily rise to the level of heinous, atrocious or cruel under the law of this state.

Victim over 65
Finally, concerning the victim being over the age of 65, the undisputed evidence presented at trial shows that Della Beaugh was over 70 years old when she was killed.
Here, the state proved three of the four aggravating circumstances beyond a reasonable doubt. While the state did not necessarily establish that the murders were committed in an especially heinous, atrocious or cruel manner, the failure of one or more statutory aggravating circumstances does not invalidate a death penalty if another statutory aggravating circumstance is supported by the record, as long as the evidence offered in support of the arguably unproved aggravating circumstances did not inject an arbitrary factor into the proceedings. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Connolly, 96-1680, pp. 17-18 (La.7/1/97), 700 So.2d 810, 822. Here, the other three aggravating circumstances were clearly supported by the record, and the evidence introduced to support the failed statutory aggravating factor did not inject an arbitrary factor into the proceedings.

Proportionality
The federal Constitution no longer requires a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nevertheless, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Miller, 99-0192, p. 30 (La.9/6/00), 776 So.2d 396, 414. Pursuant to La. S.Ct. Rule 28, § 4(b), the Orleans Parish District Attorney's Office filed with this Court a list of each first degree murder case tried after January 1, 1976, in the parish.
On a state-wide basis this Court has affirmed capital sentences in a variety of *917 settings involving multiple deaths or when a defendant creates the risk of death or great harm to more than one person. See State v. Broaden, 99-2124, (La.2/21/01), 780 So.2d 349, 366; State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162; State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8; State v. Tyler, 97-0338 (La.9/9/98) 723 So.2d 939; State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076; State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 292; State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116; State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364.
Here, the state has proven not only risk of death to more than one person, but also the aggravating factors of engaging in the perpetration of an aggravated burglary and that a victim was over the age of 65. Hence, based on the above, we do not find the defendant's death penalty to be disproportionate.
For the reasons assigned herein, defendant's conviction of first degree murder and his sentence of death are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] Originally, the state indicted defendant and Lawrence Jacobs in a single indictment. The trial court granted defendant's motion to sever. Jacobs was tried first. The jury convicted Jacobs and sentenced him to death. In State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280, we reversed Jacobs' conviction and sentence due to voir dire error and remanded for a new trial. Our ruling in that case moots defendant's argument regarding the trial court's denial of his motion to admit Jacobs' conviction and sentence at trial.
[2] Earlier that morning Ms. Beaugh had spoken on the phone with her daughter in Monroe. During that conversation, which lasted from 8:52 a.m. till 8:58 a.m., Ms. Beaugh expressed no signs of anything amiss. Also earlier that morning, Mr. Beaugh's wife left to work and his children to school.
[3] Ms. Menard described one suspect, later identified as defendant, as 19-21 years of age, 5'6" to 5'7", medium build, dark complexion, natural hair style, full on top with possible fade on the sides, wearing blue jeans and a black tee shirt with light brown emblem on upper left chest. This subject was the more talkative of the two. She described the other suspect, later identified as Lawrence Jacobs, as an African-American male, 19-21 years of age, possibly 6'1" to 6'2", thin build, light complexion, wearing baggy clothing, long sleeved tan, yellow and burgundy plaid shirt, cap (color unknown), prescription glasses with round wire frames.
[4] Defendant's hearsay objection to this statement was sustained, but his mistrial motion was denied. Defendant stresses that the trial court granted his pre-trial motion to exclude any reference to the hearsay statement regarding the two African-American males observed running from the van. Given defendant's admission that he and Jacobs abandoned the van in the Iberville Housing Development, even assuming this statement was hearsay, admitting it was harmless error, and the mistrial motion properly was denied. See also State v. Prudholm, 446 So.2d 729, 741 (La.1984) (officer's remark allegedly casting the accused as an associate of criminals was not prejudicial and did not impact the fairness of trial).
[5] Defendant argues that the trial court erred in denying his motion to suppress these three statements as fruits of an illegal detention. While defendant admittedly was not under arrest for the instant double homicide when he gave the initial exculpatory statement, he had voluntarily turned himself in on outstanding attachments. These outstanding attachments provided a valid basis for detaining defendant during the seventeen hour interval between his initial exculpatory statement and his subsequent inculpatory ones. See Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). And, shortly after giving his initial statement, defendant was arrested for the instant double homicide; Ms. Menard's positive identification of him provided the probable cause for that arrest. The trial court thus did not err in admitting defendant's inculpatory statements. See State v. Yarbrough, 418 So.2d 503, 506 (La.1982)(admissibility of a confession is a question for the trial court, and its conclusion on the credibility and weight of testimony will not be overturned on appeal unless not supported by the evidence).
[6] Defendant's hearsay objection to Dauth's testimony regarding the consent search of the Grant's residence was overruled. While defendant reurges that objection, we find it lacks merit. See State v. Calloway, 324 So.2d 801, 809 (La.1976); State v. Monk, 315 So.2d 727, 740 (La.1975)(as a general matter, the testimony of a police officer may encompass information provided by another individual without constituting hearsay if offered to explain the course of police investigation and the steps leading to the defendant's arrest). Even assuming the trial court erroneously admitted the testimony, the admission was harmless given defendant's admission directing police to the stolen property at that residence. See State v. Hearold, 603 So.2d 731, 739 (La.1992).
[7] While defendant filed a motion to recuse the entire Jefferson Parish District Attorney's office based on Amstutz employment with that office, the trial court correctly denied that motion. We have consistently held that "[t]he mere fact that an assistant district attorney previously represented an accused does not ipso facto require disqualification of the District Attorney in the criminal proceeding." State v. Bell, 346 So.2d 1090, 1100 (La.1977). It follows then that defendant's reliance on the mere fact Amstutz previously represented him to require recusing the entire District Attorney's office is misplaced.
[8] The trial judge in this case was also the trial judge in that earlier, unrelated case. See State v. Bridgewater, 98-658 (La.App. 5th Cir.12/16/98), 726 So.2d 987(affirming defendant's conviction of two counts of armed robbery and one count of aggravated burglary and sentence of thirty years at hard labor for each count, to run concurrently, and noting that trial judge specified the sentences for the armed robbery convictions were to be served without benefit of parole, probation, or suspension of sentence and that co-defendant, Jacobs, plead guilty to those unrelated charges).
[9] Armato had a conflict that arose out of his acquaintanceship with the victim's distant relative. Defendant complains that the transcript of that first trial is not part of the record. The record, however, contains all pre-trial motions Armato filed before he withdrew. Because the mistrial was declared after jury selection, but before trial commenced, a transcript of the voir dire is unnecessary for this appeal; a whole new jury was selected for the instant case.
[10] In response to defendant's complaint that the transcript from that hearing is not in the record, the state supplemented the record with a copy of that transcript. Defendant also complains that the trial court erred in refusing to continue this "tentative date," citing the three grounds he urged; to wit: (i) that date gave newly appointed defense counsel, Dohre, only three and a half months to prepare; (ii) penalty phase co-counsel, Ms. Short, voiced a pre-existing conflict (that date coincided with her pregnant daughter's due date); and (iii) that date coincided with the two-year anniversary of the crime. Granting or denying a motion for a continuance is a decision that rests within the sound discretion of the trial judge, and a reviewing court will not disturb such decision absent a clear abuse of discretion. La.C.Cr.P. Art. 712 (providing that "[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefore"); State v. Bourque, 622 So.2d 198 (La.1993). Given Dohre was defendant's third IDB counsel, coupled with the fact the judge took several measures to avoid any reminders of the October 31st anniversary date in the courtroom (including making the clerk keep Halloween candy and decorations out of sight), we find no abuse of discretion.
[11] The four aggravating circumstances the jury found were: 1) that the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary; 2) that the offender knowingly created a risk of death or great bodily harm to more than one person; 3) that the offense was committed in an especially heinous, atrocious or cruel manner; and 4) that one of the victims was sixty-five years of age or older. La.C.Cr.P. art. 905.4(A)(1),(4),(7),(10).
[12] We have reduced a first degree murder conviction to second degree murder without remanding for a new trial on at least three prior occasions. State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134; State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651; State v. Bay, 529 So.2d 845(La.1988). As we noted in Bay, supra, "[w]hen the evidence does not support the conviction, the discharge of the defendant is neither necessary nor proper if the evidence supports a conviction for a lesser included offense. State v. Byrd, 385 So.2d 248 (La.1980)." 529 So.2d at 846 n. 1.
[13] More precisely, the state was required to prove: (1) that defendant had the specific intent to kill or to inflict great bodily harm and was engaged in the perpetration or attempted perpetration of an aggravated burglary or armed robbery or both, La. R.S. 14:30(A)(1); (2) that defendant had the specific intent to kill or to inflict great bodily harm upon more than one person, La. R.S. 14:30(A)(3); or (3) that defendant had the specific intent to kill or to inflict great bodily harm upon a victim who was sixty-five years of age or older, La. R.S. 14:30(A)(5).
[14] At oral argument before this court the state's attorney suggested that the evidence against defendant was "not the best." The evidence the state relies upon is the possibility noted by the ballistics expert that while all three bullets were .38 caliber class, the bullets could have come from two different guns. The state also relies on the possibility raised by the autopsy that the angles from which the shots were fired implicates two different gunmen. The state also cites defendant's admission to being one of the two people present on the scene, and that there were two people dead. As a fall-back position, the state argues that if the evidence is insufficient to establish specific intent to kill, then, by definition, defendant admitted to second degree murder.
[15] La. R.S. 14:24 provides that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."
[16] See footnote twelve.
[17] La.C.Cr.P. arts. 647, 648; State v. Rogers, 419 So.2d 840, 843 (La.1982).
[18] State v. Perry, 502 So.2d 543, 549 (La. 1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); State v. Machon, 410 So.2d 1065, 1067 (La.1982); State v. Morris, 340 So.2d 195, 203 (La.1976); State v. Franks, 391 So.2d 1133, 1135 (La.1980), cert. denied, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818 (1981)("Neither the testimony of his mother nor that of Dr. Ellington created a reasonable ground to doubt defendant's mental capacity to proceed."); State v. Hicks, 286 So.2d 331, 333 (La.1973) (When defense counsel presented no evidence on the motion for appointment of a sanity commission, and the psychiatrist asked by the court to examine the defendant reported that the defendant appeared to have the capacity to proceed, "[t]he only logical conclusion that can be drawn from this record is that the defense has failed to convince the court that there was a reasonable ground to doubt the defendant's mental capacity to proceed.")
[19] Although appellate counsel relies heavily on Dr. Colon's psychiatric evaluations done in preparation for the defendant's penalty phase to suggest incompetence, Dr. Colon's report was reviewed by the trial court in denying defendant's motions, and the trial court found it unpersuasive. While defendant complains that this report is not in the record, at the pre-trial hearing at which Dr. Colon's report was addressed, defense attorneys argued that if the court admitted this report and turned it over to the state, they would seek writs challenging the ruling. It follows then that due to the defense's own actions this report was never entered into evidencesealed or otherwise.

Defendant also complains that a bench conference held during a hearing on his motion to appoint a sanity commission was not in the record. Given the lengthy subsequent bench conferences that were recorded regarding defendant's repeated motions to appoint a sanity commission, this omission is clearly not material.
[20] State v. Seiss, 428 So.2d 444, 447 (La. 1983); State v. Johnson, 389 So.2d 1302, 1304 (La.1980), State v. Jones, 376 So.2d 125, 129 (La.1979); State v. Lee, 364 So.2d 1024, 1028 (La.1978).
[21] Defendant's real objection appears to be the composition of the entire venire, as evidenced by defense counsel's statement that "Judge, that this is the second of the only two [African Americans] in the 28 people who have been called up here today and we're definitely lodging an objection." Defendant's failure to challenge the venire timely resulted in a waiver of such challenge.
[22] State v. Sanders, 93-0001 at pp. 20-21 (La.11/30/94), 648 So.2d 1272, 1288-89; State v. Wingo, 457 So.2d 1159, 1166 (La. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Harper, 430 So.2d 627, 635-636 (La.1983); State v. Tribbet, 415 So.2d 182, 186 (La.1982); State v. Smith, 430 So.2d 31, 44 (La.1983).
[23] See also Sanders, 93-0001 at p. 20, 648 So.2d at 1288 ("As to the five ultimately selected to sit on the petit jury, the individual questioning by the trial judge supports the conclusion that although the jurors had suffered exposure to the publicity, none were so impressed by it as to be incapable of rendering a fair and impartial verdict"); State v. Young, 569 So.2d 570 (La.App. 1st Cir.1990), writ denied, 575 So.2d 386 (La.1991); State v. Hunter, 551 So.2d 1381, 1385 (La.App. 3rd Cir.1989); see also Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) ("The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial.... Generalizations beyond that statement are not profitable, because each case must turn on its special facts.")
[24] In denying the mistrial motion, the trial judge agreed to question each of the jurors about their exposure to the article and to repeat his prior instruction to the panel that they are not to read the newspaper. Moreover, both jurors who admitted they read the article were excused and two other jurors who indicated they were exposed to prior articles or publicity were excused. And, as the state stresses, none of the jurors who actually decided the case were exposed to the article.
[25] The federal jurisprudence is in accord. Indeed, almost one hundred years ago, the Court in Falk v. United States, 15 App.D.C. 446 (1899), held that to afford a defendant relief based on his own misconduct would be to give him a tool by which he can effectively prevent forever a final determination of his guilt. "To allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very process that the Constitution prescribes." Illinois v. Allen, 397 U.S. 337, 350, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)(Brennen, J., concurring).
[26] State v. Jack, 554 So.2d 1292, 1295-96 (La.App. 1st Cir.1989), writ denied, 560 So.2d 20 (La.1990); Cf. State v. Watson, 449 So.2d 1321, 1328 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985)(police officer's unsolicited remark is not the comment of a "court official" under La.C.Cr.P. art. 770); State v. Holmes, 94-0907 (La.App. 5th Cir.3/15/95), 653 So.2d 642 (police detective's testimony that photograph of defendant used in photographic lineup was "booking" photograph did not entitle defendant to mistrial).
[27] Defendant also claims that the prosecutor argued facts not in evidence by improperly referring to the co-defendant-Jacobs' statement, citing the following remark: "[t]here are four people who know who pulled the trigger in that room. Two of them are dead. The other twowell, you know the other two, you know what he says. You know from Lieutenant Snow that nobody ever admitted to shooting anybody." This portion of the state's argument accurately reflects the testimony of Lieutenant Snow, quoted above, that neither co-defendant admitted to being the shooter. The prosecutor's argument summarizing Ms. Snow's testimony was proper.
[28] The alleged record omissions discussed elsewhere in this opinion are not repeated here.
[29] See footnote thirty-three addressing defendant's argument regarding the "acquit first" instruction. As to defendant's other two arguments regarding jury instructions, those pertained to the instruction on "principals" and the judge's failure to instruct on the elements of aggravated burglary (an underlying felony). Defendant's arguments regarding those two instructions were rendered moot by our reversal of defendant's first degree murder conviction. Regardless, defense counsel did not object properly to the jury instructions and therefore did not preserve the issue for appellate review.
[30] La.C.Cr.P. art. 808 provides that "[i]f the jury ... after having retired to deliberate ... desires further charges, the officer in charge shall bring the jury into the courtroom, and the court shall in the presence of the defendant, his counsel, and the district attorney, further charge the jury."
[31] See State v. Martin, 93-0285 at p. 18 (La.10/17/94), 645 So.2d 190, 200, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995); State v. Kyles, 513 So.2d 265, 275 (La.1987); State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Knighton, 436 So.2d 1141, 1152 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. Dupre, 408 So.2d 1229, 1234 (La.1982).
[32] Specifically, defendant complains of the following remarks during voir dire:

"You could have a doubt, and remember, there will always be that voice that's telling you to look for doubt, telling you to say, there's got to be doubt here, then our client is not guilty."
"And remember all the time the defense's job is going to be to get you to look for doubt and they're going to throw some stuff up there, I'm sure, and you have to sort it out." Defendant further complains of the following remarks during closing argument:
"To think that intelligent jurors like you are going to have to listen to somebody make excuses and have somebody argue to you about excuses as to what criminal intent is; you're smart enough to look at the facts, you're smart enough to say that, Yeah, okay, I'm going to listen to what you got to say but the facts are the facts."
"Well, he hires himself a good lawyer and he gets a lawyer that's going to be able to take that intent thing and kind of twist it around and hope that he can play the odds... he knows that the odds aren't good that all 12 of you are going to buy this nonsense that he had no intent to kill anybody."
[33] As noted, defendant argues that the trial court erroneously gave an "acquit first" instruction; more specifically, defendant urges us to reconsider our holding in State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), approving this "step down" instruction. In Sanders, supra, this court unanimously rejected the attack on the "step down" instruction, which requires jurors to acquit the defendant of first degree murder before they consider any of the responsive verdicts. We concluded that the charge does not create a reasonable likelihood that jurors will apply it in an unconstitutional manner by considering responsive verdicts otherwise supported by the evidence at trial withdrawn from their consideration. We decline defendant's invitation to revisit this issue.
[34] Defendant challenges the repeated playing of the recording of Ms. William's 911 call, especially during argument, and characterizes this as "victim impact evidence" being improperly introduced during the guilt phase. We find no merit to this argument. Defendant also challenges the admissibility of the gruesome photographs and argues that the trial court committed reversible error by allowing the state to introduce these autopsy photographs, especially those showing a metal rod inserted into the victims' bullet wounds. Defendant contends that the prejudicial effect of these photographs outweighed their probative value under La.C.E. arts. 401, 403.

Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence; the state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. State v. Koon, 96-1208 at p. 34 (La.5/20/97), 704 So.2d 756, 776, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997); State v. Maxie, 93-2158 at p. 11 (La.4/10/95), 653 So.2d 526, 532, fn. 8 (citing State v. Martin, 93-0285 at p. 14 (La.10/17/94), 645 So.2d 190, 198; State v. Watson, 449 So.2d 1321, 1326 (La.1984); State v. Kirkpatrick, 443 So.2d 546, 554-55 (La.1983)); State v. Perry, 502 So.2d 543, 558-59 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987)). In this case, the photographs at issue were introduced during the state's redirect questioning of its forensic pathologist, Dr. Susan Garcia, who performed the autopsies. The photographs corroborated Dr. Garcia's testimony regarding the trajectory of the bullets that killed the victims. Contrary to defendant's contention, the probative value of these photographs was not outweighed by their prejudicial effect.
[35] Nor does defendant's cumulative error argument pertaining to all of his pre-trial and guilt phase assigned errors have any merit. See Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir.1987) (court rejects cumulative error claim and finds that "twenty times zero equals zero"). As noted earlier, we pretermit addressing the penalty phase assigned errors given our reversal of defendant's first degree murder conviction and death sentence.
[1] The majority finds that the defendant was not a principal under La. R.S. 14:10(1) for his failure to act to prevent the shooting. The majority acknowledges that "silence in the face of a friend's crime will sometimes suffice when the immediate proximity of the bystander is such that he could be expected to voice some opposition or surprise if he were not a party to the crime," but then finds that "Defendant's statement that he was in the Beaugh's garage when the fatal shots were fired places him outside the `immediate proximity.'" Op. at p. 891. However, the jury obviously did not believe the defendant's "story" that he was in the garage when the fatal shots were fired and the only evidence that the defendant was in the garage was his own self-serving statement. But, nonetheless, the majority treats this statement as if it were fact.
[1] These remaining assignments of error are addressed in an unpublished appendix, attached to this opinion and made a part of the official record.
[2] These facts are ascertainable from State's Exhibit 78, a diagram of the Beaugh family residence, drawn to scale and properly introduced into evidence during the trial. Furthermore, the state introduced into evidence a photograph of the interior of the stairwell leading to the children's playroom which clearly indicates it is enclosed. Exhibit 78 is apparently a single exhibit that was introduced in both the Bridgewater and Jacobs trials. When that single exhibit was forwarded from the district court, it was contained in the Jacobs file, not the Bridgewater file and hence, this court did not have the benefit of that exhibit when it rendered its original opinion.
[3] Lieutenant Maggie Snow, the lead investigator of the Beaugh murders, testified that when she arrived on the scene of the crime to secure the area only one garage door was open. Furthermore, Lieutenant Snow took a photograph of the garage doors and that photograph was introduced into evidence.
[4] Taken from the trial testimony of James Ducote and evident from state's exhibit 58, a photograph taken of the intersection of Fay Street and Cedar Lawn.
[5] Taken from the trial testimony of Lieutenant Maggie Snow. Lieutenant Snow was the lead homicide detective in the Beaugh homicide investigation. Lieutenant Snow testified that when she arrived at the scene, she directed that photographs be taken of the residence. One of those photographs, Exhibit 62 (properly introduced into evidence), shows that a pickup truck, identified by Lieutenant Snow as belonging to Nelson Beaugh, was parked in front of the only open garage door.
[6] Taken from State's Exhibit 78, the sketch of the Beaugh family home drawn to scale and properly introduced into evidence. The actual distance between the area of the garage where the defendant claimed to be standing and the night stand where the phone was recovered was not specifically stated at trial. However, the state did properly admit a diagram of the Beaugh residence, drawn to scale. A simple measurement shows that the distance from the interior garage door to the night stand, traveling through the hallways, was approximately 50 feet.
[7] Taken from State's Exhibit 78, the diagram of the Beaugh family home, drawn to scale and properly introduced into evidence, and the testimony of Lieutenant Maggie Snow, through whom that exhibit was introduced.
[8] We again note that defendant conceded in his statements to police that he entered the Beaugh residence with specific intent to commit an aggravated burglary. Furthermore, two people were killed, and Della Beaugh was over the age of 65. These facts combined with the jury's rational conclusion that defendant had specific intent to kill or inflict great bodily harm, makes a conviction of first degree murder proper under La.Rev.Stat. 14:30A(1), (3) and (5).