NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-1136


STATE OF LOUISIANA

VERSUS

GEORGE E. BYRD

AKA GEORGE BYRD


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 15-1981
HONORABLE KATHY A. JOHNSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Shannon J. Gremillion, and D. Kent Savoie, Judges.


**AFFIRMED.**

**Holli A. Herrle-Castillo**
**Louisiana Appellate Project**
**P.O. Box 2333**
**Marrero, LA 70073**
**(504) 345-2801**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **George E. Byrd**

**Bradley R. Burget**
**District Attorney, Seventh Judicial Distrct Court**
**4001 Carter St., Suite 9**
**Vidalia, LA 71373**
**(318) 336-5526**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**George E. Byrd**
**MPWY/Hic-1**
**Louisiana State Prison**
**Angola, La 70712**

**EZELL, Judge.**

Defendant, George E. Byrd, was indicted on July 30, 2015, for the second degree murder of John Perritt, a violation of La.R.S. 14:30.1. On March 25, 2016, a jury found Defendant guilty as charged. On the same date scheduled for the sentencing hearing, May 18, 2016, Defendant filed a "Motion for Post Verdict Judgment of Acquittal." The trial court denied the motion and, after waiving all delays, Defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence.

Defendant appeals the conviction, asserting that the evidence was insufficient to support a guilty verdict of murder. Defendant argues that the verdict was premised entirely on circumstantial evidence and that the State failed to negate all reasonable hypotheses of innocence. For the following reasons, we find the evidence was sufficient to support the verdict of second degree murder, and the evidence presented by the State negated all reasonable hypotheses of innocence.

## FACTS

On September 22, 2014, the decomposing body of John Perritt was found outside his back door. Between the evening of September 18 and early morning of September 19, 2014, Defendant stabbed the victim in the victim's home. The victim died as a result of the stab wounds.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

# ASSIGNMENT OF ERROR

For his sole assignment of error, Defendant argues the State failed to prove beyond a reasonable doubt that it was he who stabbed the victim. Defendant points out that the verdict was premised solely on circumstantial evidence. Therefore, the State was required to negate any reasonable hypothesis of innocence. Defendant's hypothesis is that someone else killed the victim.

In *State v. Cole*, 15-358, pp. 8-9 (La.App. 5 Cir. 12/23/15), 182 So.3d 1192, 1198-99, *writ denied,* 16-179 (La. 2/10/17), 215 So.3d 700, the court held:

> In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-674 (La.6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Williams,* 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *State v. Wooten*, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied,* 99-2057 (La.1/14/00), 753 So.2d 208.

> An appellate court's primary function is not to re-determine the defendant's guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury's conclusion. *State v. Banford*, 94-883 (La.App. 5 Cir. 3/15/95), 653 So.2d 671, 677. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Workman*, 14-559 (La.App. 5 Cir. 4/15/15), 170 So.3d 279, 289. When there is conflicting testimony about factual matters, the resolution of which depends on a determination of credibility of the witnesses, this is a matter of the weight of the evidence, not its sufficiency. *State v. Brown*, 01-41 (La.App. 5 Cir. 5/30/01), 788 So.2d 694, 701. "The Jackson standard does not serve as a vehicle for a reviewing court to second guess the

4

rational credibility determinations of the fact finder at trial." *State v. Hotoph*, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045.

Furthermore, as noted by the supreme court in *State v. Brown*, 03-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18, *cert. denied,* 547 U.S. 1022, 126 S.Ct. 1569 (2006):

> When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." [*State v.*] *Neal,* [00-674 (La. 6/29/01)], 796 So.2d [649] at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under *Jackson* to prove guilt beyond a reasonable doubt to a rational jury. *Id.* (citing *State v. Rosiere*, 488 So.2d 965, 968 (La.1986)).

However, in *State v. Bridgewater*, 00-1529, pp. 8-9 (La. 1/15/02), 823 So.2d 877, 889, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266 (2003) (alteration in original), the supreme court stated:

> "[h]ypotheses of innocence are merely methods for the trier of fact to determine the existence of a reasonable doubt arising from the evidence or lack of evidence." *State v. Shapiro,* 431 So.2d 372, 389 (La.1982) (on reh'g )(Lemmon, J., concurring). This circumstantial evidence rule is not a separate test from the *Jackson* standard; rather, La. R.S. 15:438 merely "provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found defendant guilty beyond a reasonable doubt." *State v. Wright,* 445 So.2d 1198, 1201 (La.1984). "Although the circumstantial evidence rule may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence" *State v. Chism*, 436 So.2d 464, 470 (La. 1983).

In the current case, Defendant was charged with second degree murder, which is the killing of a human being with the specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1.

**Testimonies and exhibits introduced at trial**

Jack Fletcher, a captain with the Concordia Parish Sheriff's Office, testified that at approximately noon on September 22, 2014, he received a call about a body found at a residence in Monterey, Louisiana. Upon arrival at the location, he met with Albert Crouch, who had found the victim's naked body wrapped in blankets next to the back door steps. Inside the house, the captain and two other deputies found a great deal of blood on the floor next to the bed in the master bedroom. All the sheets were removed from the bed. There were bloody footprints tracked throughout the house. The captain speculated that the victim was killed in the bedroom, then wrapped in blankets, and dumped out the back door. Because there appeared to be two different sets of footprints, the captain speculated there were two persons involved. The captain took eighty-two pictures inside and outside the crime scene. Each picture was shown to the jury and clarified by the captain.

Captain Fletcher testified he learned from the victim's son, Jason Perritt, that the victim was diabetic. A search of the house located a blood glucose tracker. Apparently, the victim was very organized and kept meticulous track of his blood sugar levels. The tracker listed the blood sugar levels each morning before breakfast and again after dinner. The last notation was entered on the early evening of September 18, 2014.

Captain Fletcher stated that when he was advised by a deputy who had attended the autopsy that the victim was stabbed to death, the captain went back to the victim's house and collected knives for DNA and fingerprint analysis.

Captain Phillip Webber, at the time a detective with the Concordia Parish Sheriff's Office, took over the case as lead investigator. He had swabs taken of the blood left around the bedroom and had the house dusted for fingerprints. He noted

no prints were found for analysis, not even the victim's prints. He noted that there were two different sized, bloody shoe prints and that there were no drag marks through the kitchen to the back door, indicating that the body was carried out. The captain was advised that a fifty-inch flat screen television, an iPad, and a pistol were missing from the victim's house. The victim's wallet, cell phone, and vehicle were also missing. The captain put out a BOLO (be on the lookout) for the victim's vehicle.

Captain Webber obtained a warrant for the victim's bank records. The bank records showed that in the early morning of September 18, at 12:30 a.m., the victim used his debit card at Walmart. A few hours later, he used the debit card at a Circle K in Ferriday, and on the evening of the September 18, he used his debit card at Walmart in Natchez around 8:00 p.m. Walmart's surveillance video showed that no one was with Mr. Perritt in Walmart or when he left and got into his vehicle.

When Captain Webber called the victim's cell phone number, "it went straight to like it was a disconnect." He applied for a warrant for the cell phone records. According to the phone records, the last outgoing call on the victim's phone was at 9:54 p.m. and the last outgoing text was at 9:59 p.m. on September 18, both to the same phone number. The phone number called was listed to Kimmie Isaac, who lived in Vidalia. The captain could see in the victim's phone records that there were several calls and texts sent to the victim from Ms. Isaac's number the evening of the September 18 through September 23. The captain learned that Ms. Isaac's son, Kenzell Isaac, used her cell phone frequently. The victim's phone number was listed in Ms. Isaac's phone contacts under "lick." The captain interviewed both Ms. Isaac and her son. It was after the interviews that the captain began looking for Defendant.

Ms. Isaac did not know the victim. She gave the captain permission to search the cell phone and to obtain its call records.

The victim's vehicle was located in Natchez, Mississippi, on September 23, 2014. The owner of a lumber yard in Natchez, Bruce Reynolds, noticed that a strange vehicle was parked in the lumber yard's parking lot from the morning of September 19, 2014, to September 23. When he saw that the vehicle had temporary license plates with the dealership listed, he called the dealership. The dealership had already been contacted by Captain Webber. The dealership called Captain Webber. It was noted that when the car's engine was started, the windshield wipers came on, and the radio blasted loud music.

Because the victim's car was located in Mississippi, Delane Bush, an officer with the Adams County Sheriff's Office, processed the vehicle before turning it over to Captain Webber. A minute amount of blood was located inside the vehicle, but no fingerprints were found inside or outside the vehicle. A Louisiana lottery ticket purchased at 9:02 p.m. on September 18 was also found in the car.

Captain Webber interviewed Kenzell Isaac on September 26, 2014. It was established that on September 18, 2014, Mr. Isaac had possession of his mother's cell phone. Mr. Isaac said that he knew Defendant as "Larry" Byrd. Mr. Isaac identified Defendant in court as the man he knew as Larry Byrd. He testified that he let Defendant use his mother's phone that evening. Shortly after Defendant used the phone and left, the victim called and asked for Defendant. The victim told Mr. Issac that Defendant was supposed to meet him at a nearby convenience store but was several minutes late. Mr. Isaac, who disclosed at trial that he was bisexual and was aware of Defendant's homosexuality and penchant for exchanging sex for money, stated that he offered the victim his services. The victim was not interested

8

and hung up. Mr. Isaac said he called the victim back repeatedly throughout the evening, the next morning, and several times over the next few days. He said the victim answered a few times that evening but otherwise ignored the calls. At some point, the phone shut off. He did not recall texting the victim. Mr. Isaac stated that although he listed the victim's phone number in his phone's contacts as "lick," he never met the victim.

Captain Webber testified that Defendant lived close to the area where the victim's vehicle was located. The captain interviewed Defendant on September 29, 2014. He stated that while Defendant refused to sign a waiver of rights form, he did verbally agree to a recorded interview. The interview was published to the jury. Defendant also submitted a buccal swab for DNA analysis following the interview.

**Summary of Video of Defendant's Interview**

The interview began with the officer reading Defendant his rights and asking whether he understood. Defendant refused to state whether he understood his rights, nor would he sign the waiver of rights form. However, he began answering questions. Initially, when he was shown a picture of the victim, he denied knowing the victim. However, he later admitted he had seen the victim in a tan truck cruising Defendant's neighborhood. Defendant stated that one time, as he stood on the street, the victim pulled up in a truck, rolled down the window, and called out Defendant's name. Defendant said the victim asked where he could get some fun. Except for speaking with him this one time, Defendant asserted he had no interaction or relationship with the victim. He stated that he saw the victim several times in the neighborhood. Defendant denied that he was homosexual or bisexual. He admitted that his girlfriend, Stephanie Armstead, made him visit a health clinic to be tested for sexually transmitted diseases because she thought he had sex with men.

9

Defendant explained that he had run away from an officer the day prior to the interview because he was on probation and had not paid his fees and court costs. Although Defendant agreed to submit to a buccal swab at the end of the interview, he still refused to sign the waiver of rights form.

**Other Testimony**

Doctor Jessica Esparza, a DNA analyst with North Louisiana Criminalistic Laboratory, testified regarding all the items collected by the police for DNA analysis.[1] The doctor stated that the only DNA she was able to identify was the victim's. In the samples that contained a major and a minor contributor, the major contributor was always the victim. She testified that Defendant and Kenzell Isaac were excluded as major contributors and the minor contributors were in such low concentration that a valid profile could not be obtained.

Doctor Christopher Tape, a forensic pathologist, conducted the autopsy on the victim's body. He noted the victim was stabbed nine times, in the neck, arm, chest, stomach, and abdomen area. He stated there were no indications of defensive wounds on the body. He also noted the toxicology report did not find evidence of any drugs in the victim's system. He concluded that the cause of death was eight of the nine stab wounds and the manner of death was homicide.

Jason Perritt, the victim's son, moved into his father's house. On January 20, 2015, late in the evening, there was a knock on the back door. Mr. Perritt answered the door, and a man asked for his father. Upon being informed that John Perritt was deceased, the man hurriedly got into his vehicle and left. Mr. Perritt, however, called

---

[1] The Crime Lab Report listed over one hundred items submitted for analysis. The list included material swatches taken from various locations in the victim's house, swatches and swabs from the vehicle, buccal swabs from every suspect and person related to victim, and swabs from items of both the victim's and Defendant's.

the police and then pursued the man. The police quickly apprehended the man and identified him as Lester Jennings.

Mr. Jennings testified at trial. At the time of trial, Mr. Jennings was in jail, charged with failure to register as a sex offender. Mr. Jennings admitted he went to the victim's house looking for money. The witness stated he had known the victim since the latter part of 2013 or the first of 2014. He stated that he met the victim late one night at a convenience store in Jonesville. He said that the victim was driving around looking to have a sexual encounter with a black man. Initially, Mr. Jennings denied having anything to do with the victim. He said the victim advanced him $40 for sexual services, but he took the money, left, and never went back. However, he stated that after he bought some crack cocaine and consumed it, he encountered the victim again, went with the victim to the victim's house, and they had sex. Mr. Jennings said that it was only a one-time occurrence because he was not comfortable having sex with a man. During Mr. Jennings' testimony it came out that he had at least three more sexual encounters with the victim. He said that the victim wanted him to move in and take care of him, but after the fourth sexual encounter, he told the victim he wanted no more dealings with him. Mr. Jennings said that the victim told him it did not matter because he had met someone in Natchez. Mr. Jennings explained that after his summertime yardwork business ran out, he decided to visit the victim and see if he could get some money. He did not know that the victim was deceased.

Thaddeus Perry, an officer with the Natchez Police Department, testified that on September 28, 2014, he was on patrol in Natchez. He stated that he had been alerted to be on the look out for Defendant. The officer encountered Defendant at a convenience store driving a vehicle with a friend, James Anderson. The vehicle

11

belonged to Stephanie Armstead.[2]  As the officer approached the vehicle, Defendant leaped out and fled on foot.  The officer pursued him, but Defendant jumped down a steep bay and escaped.  The officer returned to the vehicle where Mr. Anderson waited. The officer contacted his supervisor to have the vehicle towed.

Stephanie Armstead testified that after her vehicle was impounded by the police, she learned of the murder of a white man in Monterey.  Ms. Armstead said she gave a statement to Officer Bellings of the Natchez Police Department on October 3, 2014.  She stated that after she got her vehicle back, she had a conversation with Defendant about his possible involvement in the death of someone.  She said Defendant told her he killed a man in Monterey.  He told her that he, Mr. Anderson, and another man from McComb went to Monterey to burglarize a house.  When they arrived at the chosen house, a neighbor, an old white man, came out and told them the victim was not there.  The neighbor had a gun, and they got into a tussle.  Defendant said he took the gun from the neighbor and shot him. Defendant told her that he kept the gun, but later his brother threw the gun into the river.  Ms. Armstead testified that on October 6, 2014, she spoke with Captain Webber.  She repeated to Captain Webber the same conversation she had with Officer Bellings.  This time she said that Defendant told her he wrapped the man he killed in some blankets and left the body by the steps of the house.  She also told Captain Webber that Defendant said they took a flat screen television, an iPad, and a pistol from the house.

Ms. Armstead testified that after the first conversation with Defendant, he came back to her house drunk and threatened her not to speak of what he told her

---

[2]Ms. Armstead is also referred to as Ms. Armstead Banks at various times throughout the trial.

about killing the man in Monterey. She said he pointed a knife at her. She testified that this time, Defendant told her he killed the man because the man owed him money. Ms. Armstead stated that Defendant had been staying at her house for a while after Desmond Washington kicked him out of his apartment. She said Defendant had been staying there for a few weeks, sleeping in her room, but that they were not having an intimate relationship because he "messed with men" and that made it uncomfortable for her. However, after Defendant told her about killing the man and threatening her, she told him to leave her house. She stated that sometime later, Defendant told her that he had been living with the man he killed, but the man would not give him any money, so Defendant stabbed him. Defendant also told her that he, James Anderson, and a third man returned to the victim's house and cleaned up. Shortly thereafter, Defendant was jailed in Mississippi for unstated reasons until May 2015.

Desmond Washington testified that in September 2014 he was living in Natchez with his girlfriend, Andrea Hauer, and their four children. He stated that Defendant stayed with them some nights and some nights at Stephanie Armstead's house. In September 2014, at approximately 3:00 a.m., Defendant showed up at Mr. Washington's apartment. It was raining, and Defendant was soaking wet. Mr. Washington let Defendant in and gave him some dry clothes. Mr. Washington stated he put Defendant's wet clothes in the washing machine. Defendant appeared to be upset, stating "[B]ro, this some fucked up shit." Mr. Washington rolled a marijuana cigarette, and they smoked it. Defendant then told Mr. Washington he had just killed a man because the man owed him money. Mr. Washington said he did not believe Defendant, but later that morning when James Anderson came to the apartment, Defendant said they were going to do some lawn work. Mr. Washington wanted to

13

go with them, but they said no. Mr. Anderson told him it was going to be "some crazy shit." Mr. Washington later spoke with Captain Webber. He testified that he told the captain that Defendant said he stabbed the victim and that he and Mr. Anderson wrapped the body in blankets and lugged the body outside the house. They then went back and cleaned up the house. Defendant told Mr. Washington that he parked the victim's car at a sawmill, which was close to Mr. Washington's apartment. Defendant also told Mr. Washington that they took a television and a pistol from the house. Defendant said he threw the knife he stabbed the victim with into the river.

At the time of trial, Mr. Washington was in jail on a charge of intimidation of a witness. Ms. Armstead had accused him of threatening her if she told the police about Defendant killing the victim.

Captain Webber also testified that he collected two recently called phone numbers from the victim's phone records. Using Facebook, he identified the two phone numbers as belonging to Laura Swazy and Andrea Hauer. He located and interviewed both women.

Ms. Swazy testified at trial that she knew Mr. Washington because his brother was her youngest child's father and that she lived right down the street from Mr. Washington and Ms. Hauer. Ms. Swazy said that she overheard Defendant tell Mr. Washington that he had stabbed a white man and left his body in the grass at the victim's house.

Captain Webber testified at the end of the State's case that he never revealed to the public the cause of the victim's death, that the victim's car was found at the sawmill several days later, that the victim was found outside his back door wrapped in a blanket, or that a television, a pistol, and an iPad were taken from the victim's

house. He explained in a case such as this, keeping the details of the crime from the public was necessary to help find the perpetrator of the murder. He explained that the statements made to him by Ms. Armstead, Mr. Washington, and Ms. Swazy, giving details only the perpetrator would know, gave him probable cause to arrest Defendant for the murder of Mr. Perritt. Furthermore, the captain confirmed that it was raining the night of September 18 into the morning of September 19, 2014, when the victim's vehicle was left at the sawmill, and Defendant showed up at Mr. Washington's apartment soaking wet.

Defendant argues in brief that the evidence relied on by the State to prove he murdered Mr. Perritt—the testimonies of Ms. Armstead, Mr. Washington, and Ms. Swazy—was not credible. He asserts that each of these witnesses had an agenda, a reason to blame Defendant for the murder. He claims that Ms. Armstead's husband, James Banks, got out of jail just after the murder, and she wanted to get rid of Defendant and go back with her husband. Ms. Swazy wanted revenge. Ms. Swazy had testified that Defendant, at some time prior to the victim's death, had attempted to rob her sister and grandfather at gun point. When he did not receive whatever he wanted, he pistol-whipped the sister. As for Mr. Washington, Defendant argues:

> Finally, Desmond Washington was in his own trouble and indicated in his interview in subtext if not outright that he would say what the police wanted if it would help his case. He continued to ask if his answers were helping and continued to ask if the detective could help him out of the charges. Consequently, he had more reason to implicate Mr. Byrd than anyone else.

> The issue is not just credibility of these witnesses. None of these witnesses were testifying as eyewitnesses to the crime. Their testimony was to what they perceived Mr. Byrd told them, which is not always accurate. This is particularly true when if the witnesses are believed, Mr. Byrd would have had to have lied about how the crime was committed, as if he also did not know the details of murder.

15

## Analysis

In *State v. Spears*, 05-964, p. 3 (La. 4/4/06), 929 So.2d 1219, 1222-23, the supreme court stated that:

> [C]onstitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. *State v. Mussall*, 523 So.2d 1305, 1309 (La.1988). Rather, the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protection of due process of law.

Furthermore, as credibility of the witness is a matter of weight of the evidence and not sufficiency, determination of the credibility is left to the trier-of-fact's sound discretion and will not be re-weighed on appeal. *State v. F.B.A.*, 07-1526 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, *writ denied,* 08-1464 (La. 3/27/09), 5 So.3d 138.

Defendant argues that despite Captain Webber's testimony that the details of the crime were not made public, the three witnesses could have learned of the facts by other means. However, as noted by the State in brief to this court, each of the above witnesses' agendas were rigorously examined by defense counsel on cross-examination, and the jury apparently credited the details of the witnesses' testimonies enough to find Defendant guilty. Ms. Armstead testified that an iPad, a television, and a pistol were taken from the victim's home and that Defendant had gone back and cleaned the crime scene. Ms. Armstead also testified that the body was wrapped up in blankets and left outside the back door. Ms. Swazy stated that Defendant said the body was left outside in the grass. Mr. Washington also testified that the body was wrapped in blankets and left outside and that the crime scene had been cleaned. He had told Captain Webber that a television and a pistol were taken from the victim's house. Mr. Washington also knew that the victim's vehicle was

16

left at the sawmill on a rainy night. The witnesses' knowledge of details of the crime that were not made public supported their credibility.

Defendant further argues there were two reasonable hypotheses of innocence which were not disproved by the State. He asserts that the actions of Kenzell Isaac and Lester Jennings strongly suggested that either one of them could have been the killer. He argues that Mr. Isaac's repeated phone calls to the victim after the victim was dead was "exactly how a clever murderer would cover his tracks to throw suspicion off of himself." However, as noted by the State, there was no evidence in the record that linked Mr. Isaac to the victim or his missing vehicle otherwise nor was there any testimony or evidence that Mr. Isaac told anyone about killing someone. Defendant argues the Mr. Jennings could have gone back to the victim's house to see "what he could take to sell for drugs now that he had destroyed his only source of cash." However, it seemed highly unlikely that Mr. Jennings would have waited from September 18, 2014 to January 20, 2015, to return to the victim's house to see what more he could steal.

> Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion. Prosser, [Law of Torts, p. 212 (4th ed. 1971)] at 212.

> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn

17

from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Chism*, 436 So.2d 464, 469 (La.1983)

We find that there was no foundation to Defendant's two hypotheses of innocence, which, in both cases, were based solely on speculation. Three witnesses testified Defendant said he killed someone and revealed facts which only the perpetrator of the crime would have known. There was evidence that the victim was seeking the company of Defendant the night of the killing. There was testimony that Defendant was known for selling sexual acts. Both Ms. Armstead and Mr. Washington testified that Defendant and Mr. Anderson returned to clean the crime scene. The detectives in the case strongly suspected that the crime scene was cleaned up by two persons after the murder because of the two sets of bloody footprints. On the morning of the murder, Defendant showed up at Mr. Washington's house soaking wet because it was raining. When the victim's vehicle, which was parked within walking distance to Mr. Washington's house, was first cranked up, the windshield wipers were operating. Further, when a police officer attempted to engage Defendant shortly after the murder, Defendant fled. "Flight may be considered as evidence of a guilty mind." *State v. Petit*, 463 So.2d 749, 751 (La.App. 4 Cir. 1985); *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673 (2000).

The hypotheses of innocence suggested by Defendant were not sufficient to impact the reasonable inference drawn from the circumstantial evidence, and,

viewed in a light most favorable to the prosecution, the evidence, though circumstantial, was sufficient to support the jury's verdict.

## CONCLUSION

We affirm the conviction and sentence of Defendant for the second degree murder of John Perritt.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2-16.3.